T.C. Memo. 1998-461


UNITED STATES TAX COURT


DHL CORPORATION AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19570-95, 26103-95.      Filed December 30, 1998.

<u>Lawrence L. Hoenig</u>, <u>Frank E. Sieglitz</u>, <u>William E. Bonano</u>, <u>Sarah G. Flanagan</u>, <u>John M. Grenfell</u>, <u>Roderick M. Thompson</u>, <u>Debra L. Zumwalt</u>, <u>Richard E. Nielsen</u>, <u>Greg L. Johnson</u>, <u>Andrew D. Mastin</u>,and <u>Susan T. Brown</u>, for petitioners.

<u>Mary E. Wynne</u>, <u>Erin M. Collins</u>, <u>Cynthia K. Hustad</u>, <u>Michael J. Cooper</u>, <u>Kevin G. Croke</u>, <u>Kimberley J. Peterson</u>, and <u>James R. Robb</u>, for respondent.

CONTENTS

Findings of Fact . . . . . . . . . . . . . . . . . . . . . . . . 4
I.      Background . . . . . . . . . . . . . . . . . . . . . . 4
II.     Stock Ownership and Control . . . . . . . . . . . . . 13
III.    Operating Agreements Between
        DHL and DHLI and Related Entities . . . . . . . . . . 21
IV.     Development and Use of the DHL
        Trademark and Logo . . . . . . . . . . . . . . . . . 26
V.      Financial Condition of DHL . . . . . . . . . . . . . 33
VI.     Negotiations with UPS . . . . . . . . . . . . . . . . 37
VII.    1990-92 Transaction With Foreign
        Investors . . . . . . . . . . . . . . . . . . . . . . 37
VIII.   The Imbalance and Transfer Fees . . . . . . . . . . . 61
IX.     Technology and Systems . . . . . . . . . . . . . . . 66
X.      Respondent's Determination . . . . . . . . . . . . . 68
Opinion . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
I.      Background . . . . . . . . . . . . . . . . . . . . . 71
II.     Were Respondent's Determinations
        in the Notices of Deficiency
        Arbitrary, Capricious, or
        Unreasonable? . . . . . . . . . . . . . . . . . . . . 73
III.    The Question of Control . . . . . . . . . . . . . . . 81
        A.  Was There Common Control
            After December 7, 1990? . . . . . . . . . . . . . 82
        B.  Effect of the Trademark Transfer
            After the Foreign Investors Attained
            Their Collective Shareholding
            Majority of the New DHLI/MNV
            Entity . . . . . . . . . . . . . . . . . . . . . 85
IV.     Ownership and Value of the DHL
        Trademark . . . . . . . . . . . . . . . . . . . . . . 87
        A.  Ownership . . . . . . . . . . . . . . . . . . . . 87
        B.  Value of the DHL Trademark . . . . . . . . . . . 99
            1.  Effect of Section 482 Regulations
                on Allocation of Value. . . . . . . . . . . 125
            2.  Respondent's Alternative
                Argument--The Alstores
                Doctrine . . . . . . . . . . . . . . . . . 131
V.      Allocation of DHLI Income to DHL
        From Imputed Royalties, Imbalance,
        Transfer, and Network Fees for the
        Period 1974 Through 1992 . . . . . . . . . . . . . . 133
        A.  Background . . . . . . . . . . . . . . . . . . . 133
        B.  Royalties . . . . . . . . . . . . . . . . . . . 135
        C.  Imbalance and Transfer Fees . . . . . . . . . . 141
        D.  Network Fee . . . . . . . . . . . . . . . . . . 155

- 3 -

VI.    Are Petitioners Entitled to Setoffs
       to Any of the Section 482 Allocations
       That Have Been Sustained? . . . . . . . . . . . . . . . 159
VII.   Section 6662 Penalties  . . . . . . . . . . . . . . . . 163
Appendix . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Judge</u>:  Respondent determined deficiencies in income tax and penalties for petitioners' 1990, 1991, and 1992 taxable years as follows:

|  |  | Additions to Tax | |
|  |  | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6662(a)</u> | <u>6662(h)</u> |
| 1990 | $194,534,167 | $3,036,446.00 | $71,740,776 |
| 1991 | 13,912,891 | 1,599,675.20 | 2,365,806 |
| 1992 | 216,139,109 | 1,835,598.00 | 82,784,448 |

In addition, respondent denied timely filed claims for refund by petitioners with respect to the taxable years ended December 31, 1990, 1991, and 1992, in the amounts of $62,851, $920,991, and $3,208,934, plus interest thereon, respectively.

The following issues remain for our consideration: (1) Whether respondent's determinations in the statutory notices of deficiency were arbitrary, capricious, or unreasonable; (2) whether petitioners and certain other entities were commonly controlled, for purposes of section 482,[1] on or after December 7, 1990; (3) whether petitioners realized additional capital gain on the sale of the DHL trademark; (4) whether petitioners' postsale

---

[1]  Unless otherwise stated, section references are to the Internal Revenue Code as amended and in effect for the periods under consideration.  Rule references are to this Court's Rules of Practice and Procedure.

retention of a 15-year free domestic use of the DHL trademark results in capital gain income; (5) whether petitioners, under section 482, had additional income from forgone royalties; (6) whether petitioners, under section 482, had additional income attributable to imbalance and transfer fees; (7) whether petitioners, under section 482, had additional income from network fees; (8) whether petitioners correctly computed their net operating loss carryover deductions for 1990 and 1991;[2] (9) whether petitioners are entitled to setoffs in any year in which additional section 482 income is finally determined; and (10) whether petitioners are liable for penalties under section 6662(a) and/or section 6662(h) for taxable years 1990, 1991, and/or 1992.

FINDINGS OF FACT

I.  Background

Petitioners are DHL Corp. (DHL or petitioner), formed in 1969 in California, and affiliated subsidiaries.  At the time of the filing of the petitions in these cases, petitioners' principal place of business was Redwood City, California. Petitioner was formed by Adrian Dalsey (Dalsey), Larry Hillblom (Hillblom), and Robert Lynn, and the first initial of each last name was used to form the "DHL" name.  Lynn transferred his

---

[2]  Within the context of this issue, petitioners argued that for purposes of sec. 382 net operating loss limitations, the ownership of DHL changed on Dec. 7, 1990.  On brief, respondent conceded this point.

interest to Hillblom and Dalsey, each of whom owned 50 percent of petitioner as of November 1972, and Dalsey retired in 1984, and his shares were redeemed or transferred to other shareholders.

Petitioner's initial business activity was to pick up and deliver time-sensitive documents and small packages by means of regularly scheduled domestic airline flights between Hawaii and California. During 1970, a California corporation was formed to handle documents and packages between Los Angeles and San Francisco. Hillblom recruited John T. Atwood (Atwood) and William A. Robinson (Robinson) from another courier service to operate the Los Angeles to San Francisco business, which was merged with DHL on November 11, 1972, at which time Robinson and Atwood were each given a 7-percent stockholding interest in DHL. During 1972, a station was established in Hong Kong and incorporated there under the name Document Handling Limited, International (DHLI). DHLI was incorporated in Hong Kong on March 14, 1972, and its stock was owned 99 percent by DHL and 1 percent by Dalsey. Po Chung, a Hong Kong resident, was recruited by Dalsey to act as DHLI's first manager. By late 1972 or early 1973, DHL was also offering service through a variety of entities to Guam, Hong Kong, the Philippines, Japan, Thailand, Australia, and New Zealand.

The national and international expansion of DHL's activity was accomplished by employees and/or stockholders going to a new

location to establish an operational system/entity to facilitate pickup and delivery of documents and small packages to and from the United States and other locations.  During 1972, Robinson traveled to Sydney, Australia, and met David Allen (Allen), and they began a pickup and delivery service there.  Early on, employees who established the service in some locations accepted equity interests because of insufficient funds to pay them.

Setting up an international station generally involved the obtaining of space at the local airport, making arrangements with the local government customs officials, setting up an office location, acquiring vehicles, and hiring and training local managers.  Within a relatively short time, operations were established in Auckland, New Zealand; Fiji; Jakarta, Indonesia; Singapore; Kuala Lumpur, Malaysia; Caracas, Venezuela; Johannesburg, South Africa; and Sao Paulo, Brazil.

The growth of the DHL network, especially in the earlier years, was attributed to a free-form approach to expansion. Although a regimen eventually developed, the business expanded and grew because of the flexibility and freedom of the management and employees to provide service to customers that comported with their customs and locality.  After some problems involving the Civil Aeronautics Board (CAB), operations were divided between U.S. and international locations.  Even though there was common shareholder ownership of the U.S. and international corporate

entities, the two operations were allowed to develop separately in a manner that best suited local expansion and success. Although DHL and DHLI generally operated separately, certain physical facilities were operated for their joint benefit, and, occasionally, the companies used networkwide compensation incentive plans for their executives. At executive levels, there was commonality and "secunding" (sharing) of employees by and between DHL and DHLI. At the shareholder levels, there was common control of DHL and DHLI.

The companies making up the DHL worldwide network cooperated through the Network Steering Committee (NSC), composed of DHL shareholders, senior management, and representatives of the three principal corporations, DHL, DHLI, and Middlestown, N.V. The NSC's purposes were to establish network policies and strategies, address each company's network rights and obligations, and present a uniform organizational image to DHL customers worldwide.

One of the things that led to the success of the DHL network was the use of a flat-rate pricing structure, where the customer was charged a monthly rate for all shipments. Under this approach, profit was sought on the consolidation or volume strategy. DHL also developed color-coded pouches with distinctive markings that were known to customers and made package handling easier and more efficient.

In the early 1970's, one of petitioner's competitors filed a complaint with the CAB, alleging that petitioner was not just a courier but also operated as an international air freight forwarder. The competitor complained that, as a result of the international freight forwarding, petitioner was required to have CAB operating authorization, which it did not have at that time. On April 11, 1972, petitioner filed for CAB interstate and international operating authorization, and the complaining competitor objected. CAB regulations prohibited individuals who were not U.S. citizens from owning more than 25 percent of a U.S. air freight forwarder. On May 24, 1973, DHL and Dalsey transferred their DHLI shares to nominees, ostensibly foreign, of Po Chung for little or no consideration. After that transfer of the DHLI stock, the CAB, on December 19, 1973, authorized DHL's status as an interstate and international air freight forwarder.

Thereafter, the CAB prohibition on foreign "control" of DHL was a significant factor in corporate and shareholder decisions to attempt to keep foreign and domestic activities separate. Operationally, DHL and DHLI, with limited exceptions, were autonomously managed by their respective officers, but with a common commitment to the DHL network. The exceptions involved DHL's chief executive officer's responsibilities over DHLI's Canadian, Mexican, and Latin American operations. The common commitment to the network was nurtured by the NSC, consisting of

senior managers representing DHLI and DHL, who met three or four times a year to exchange information and discuss operational issues of common interest. The companies that made up the entire DHL network were at all times, through September 1992, controlled by common interests.

In 1974, Hillblom hired Peter J. Donnici (Donnici), a lawyer and law professor, to represent DHL in the CAB matter. About that time, Hillblom asked Donnici to establish a law office in Donnici's name and to continue to represent DHL. L. Patrick Lupo (Lupo), a law student of Donnici's, was employed to assist in the CAB litigation. After graduation from law school, Lupo was named general counsel of DHL. A few years later, Donnici and Lupo formed a law partnership that eventually became known as Donnici, Kerwin & Donnici. DHL was the firm's primary client, and it also did legal work for DHLI and DHL shareholders. Donnici became Hillblom's business and general legal adviser and consultant on major business decisions. Donnici and Hillblom were also personal friends. DHL, and at one point DHLI, paid expenses of the Donnici law firm, including rent, overhead, and all salaries.

In the early 1980's, Donnici received DHL shares for his past work for DHL, a third of which he gave to Lupo for work he had done. Donnici was also a director of DHL from the early 1980's until the early 1990's. While a director of DHL, Donnici received a retainer from DHLI in the amount of $48,000 per year.

After the transfer of DHLI stock to Po Chung and nominees, DHLI was used for foreign operations and DHL for domestic. DHL Operations B.V. (Ops B.V.) was incorporated in the Netherlands on August 13, 1979, as a wholly owned subsidiary of DHLI. When Robinson and Allen formed the Australia station under the name Document Handling Limited, Australia, Robinson was a DHL employee who had invested his own funds in this business. The business founded by Robinson and Allen eventually became known as Middlestown, N.V., a Netherlands Antilles company (MNV) incorporated on June 26, 1979. For most of the period 1974 through September 1992, DHLI, its subsidiary, Ops B.V., and MNV were the controlling and operational entities of the international portion of the DHL delivery network.

For the period beginning in 1972 and extending into 1992, DHL was responsible for handling the courier business inside the United States, and DHLI was responsible for handling the courier business outside the United States. Each company serviced shipments that were: Solely within its jurisdiction; from its jurisdiction that were bound for destinations outside its jurisdiction; and received from outside its jurisdiction with destination points inside its jurisdiction. DHL would also handle shipments from outside its jurisdiction that were merely passing through DHL's jurisdiction on the way to another destination that was outside DHL's jurisdiction.

For shipments to locations outside DHL's or DHLI's territory or jurisdiction, the documents or packages would be sent to a "foreign" clearing point of the other company, and they would then be completely processed by the receiving company. For example, if DHL picked up a package in San Francisco that was bound for a location in Southeast Asia, it would be transferred to DHLI at one of DHLI's foreign points of entry, and then DHLI would take responsibility for customs clearance, further transportation (frequently across international borders), and delivery to the foreign consignee. The entity to whom the customer first submitted the package was paid by the customer and retained the payment even though another entity delivered the package. Accordingly, in the above example, DHL would retain the customer's payment even though a DHLI/MNV company completed the delivery. The worldwide air express service operated by DHL and DHLI was generally represented as, and perceived to be, a single worldwide delivery system (DHL network).

In the foreign portion of the DHL network, local operating companies and independent agents operated under agreements with DHLI and related companies. Normally, local operating companies or agents billed customers an all-inclusive price for shipments to other service areas. The local operating companies or agents normally retained a percentage or predetermined portion of the revenue received from their customers and remitted the remainder

to the DHLI corporate entities as a "network fee". Although DHL was DHLI's pickup and delivery agent in the United States and vice versa, neither paid a fee to the other, and each was allowed to retain the full amount charged to the initiating customer until 1987.

The only exception to this reciprocal arrangement was the on-forwarding fee that DHLI charged to DHL through the 1986 year for some 10 destinations in the Middle East and Southeast Asia because of the great distances from the entry gateways to those destinations. The reciprocal no-fee arrangement was allowed to exist during the 1970's and until 1986. No specific method had been developed to account for each shipment during that time.

As of 1992, the DHL network extended to approximately 195 countries. In each of those countries (other than the United States), pickup and delivery functions were performed either by a local operating company that was a corporate affiliate of DHLI or MNV, or by an independent agent. Most of the local operating companies were subsidiaries of MNV. Thus, MNV (through its subsidiaries) provided pickup and delivery services in many countries, while DHLI operated the network that linked those countries together.

As of 1988 the DHL network was, internationally, the third largest air courier company, with a global market share of about 8 percent, of which somewhat less than 40 percent arose from

outbound shipments from the United States. Around 1985, a study reflected that DHL ranked first for international service in the user samples, and its customer awareness was highest among large shippers who shipped packages both domestically and internationally. A 1986 report explained that DHL had a high name awareness even though the amount spent to advertise the name at the time was low. Although DHLI/MNV (international business) was growing faster and was more successful during the 1980's, as of the time of the transactions in question, DHL remained a important part of the worldwide delivery network. DHL was valuable to DHLI/MNV by delivering packages in the United States and by providing shipments originating in the United States to the international portion of the network for delivery. Without DHL, the DHL network would have had to obtain a delivery agent to deliver international-origin shipments in the United States and find new sources of outbound shipments from the United States. As of the time of the transactions in question, over 20 percent of the total third-party revenues earned by the DHL network outside the United States was estimated to be attributable to DHL.

II.  Stock Ownership and Control

As of December 1, 1989, 77.61 percent of DHL's outstanding stock was owned as follows:  Hillblom, 46.75 percent; Cheiro's Consultancy Services Ltd. (Cheiro), 21.59 percent; and W.

Robinson, 9.27 percent.  The remaining 22.39 percent of DHL's outstanding stock was owned by others--one of them owning 9.27 percent, and the remainder each owning less than 5 percent. Cheiro was a Hong Kong corporation, the stock of which was held 50 percent by Allen and 50 percent by Po Chung, from 1977 through September 1981.  After that time, Cheiro stock was held by Allen or for his benefit through various entities.

As of the time of the transactions in question, DHLI's stock was held through Mattawan Ltd. (Mattawan), a Hong Kong corporation, which served as an intermediate entity.  It was owned 49 percent each by Po Chung and Hillblom, and the remaining 2 percent was held by the Mattawan Employees Trust.  MNV's stock was held 49 percent by Robinson and 51 percent by Allen through several intermediate entities.  From the relatively early foundations of DHL, DHLI, and MNV, through the time when the foreign investors became involved in the DHL network, Hillblom, Po Chung, Allen, and Robinson, collectively and functionally, were the controlling shareholders of the DHL network entities and the DHL network.  Amongst the four controlling shareholders, Hillblom was the most influential.

In the mid-1970's Donnici introduced Allen to Stephen J. Schwartz (Schwartz), a tax attorney, who began representing some of the DHL shareholders and their related entities.  Schwartz' focus was on the minimization of tax, which, among other methods,

was saved by placing corporate entities in low-tax jurisdictions. DHLI/MNV, the foreign entities, grew faster than DHL during the 15-year period preceding the 1990 transaction.

Schwartz formed Management Resources International Ltd. (MRI) in Hong Kong on January 27, 1981, largely for tax reasons. William Walden, who was hired by and connected to Hillblom, was placed as head of MRI. MRI contracted with DHLI, MNV, and DHL to supervise and coordinate the DHL network, including "(i) the development of information and advice, (ii) direction and implementation of policies relating to marketing, advertising, operations, electronic data processing, accounting, legal issues and insurance, (iii) project research and development, and (iv) strategic planning."

Before 1989, DHL, DHLI, and MNV used MRI to enhance the commercial benefits derived from the DHL network. The NSC also had oversight of MRI and, in 1989, agreed to its legal reorganization. DHL, DHLI, and MNV management reported through their regions to the NSC's chief executive officer. By 1988, more than half of MRI's employees worked in the United States, and they were covered under DHL's employee benefits package. DHL and DHLI periodically advanced funds to MRI to enable it to meet its costs. Bedford Management Group, Inc., held 49 percent of MRI's stock. At the behest of the DHL shareholders, Schwartz,

Donnici, Lupo, and Charles Lane (Schwartz's law partner) held equal shares of the stock of Bedford Management Group, Inc.

During 1987, the central management organization was reappraised, and it was decided that the considerable growth in the business and increasing competition intensified the need for a coordinating body that could continue to project and maintain the DHL worldwide network with uniform operational and service standards.  In 1988, DHL established the Worldwide Coordination Center (WHQ) in Belgium.  Three superregions were established, each with its own chief executive officer (CEO). Po Chung was CEO for the Asia Pacific region; Patrick Foley, DHL's CEO, was CEO for North and South America; and Robert Kuijpers was CEO for Europe, the United Kingdom, and Africa.

WHQ was to direct, support, and advise the regions, to supervise compliance with global policies, and to ensure that the regions adopted a consistent approach to key issues.  It had responsibility for establishing strategy, coordinating resource allocation, and supporting and advising regional management, including coordinating with DHL, to ensure that operating procedures and service levels established centrally or recognized as best demonstrated practice were used throughout the DHL network.  A Worldwide Services Department was also established to be responsible for directing and coordinating the integration of operations and marketing initiatives across regions; coordinating

purchased air operations; advancing the worldwide implementation of best demonstrated practices in operations, sales, and marketing; and overseeing the global accounts program.

Lupo was DHL's general counsel from 1976 through December 1, 1984; CEO for part of 1986; a member of DHL's board of directors from the early 1980's until 1990 and chairman of its board of directors from 1985 through September 1986; and from the early 1980's to the time of trial, a minority shareholder of DHL. In 1985, Lupo moved to England to coordinate the service requirements of DHL operations in Canada, Mexico, and Latin America with DHLI and MNV. Lupo continued in that role until 1988.

From 1986 into 1988, at the request of Po Chung, Lupo coordinated the activities of DHL, MNV, and DHLI pursuant to an agreement with DHLI. Lupo also performed services for MRI. He was involved in MRI's 1985 global strategic planning for DHL. From 1988 until 1992, DHL paid Lupo's compensation and benefits, but permitted him to serve DHLI. He performed his coordination activities as CEO of WHQ beginning in 1988. In 1990, with the entry of the foreign investors, Lupo was placed on the boards of directors of DHLI and MNV.

DHLI provided necessary capital to DHL through Nirada Corp. B.V., a Netherlands corporation formed for that purpose. DHL's domestic expansion during the 1980's was, in part, intended to

increase and protect DHL's international market share. Although the operating officers of DHLI were not in favor of the expansion, DHLI benefited because it was able to offer more U.S. delivery destinations to its customers.

On December 7, 1982, Hillblom acquired 49 percent of the stock of Mattawan, for which he was to contribute $150,000. At that time, DHLI had retained earnings of HK$433,521,201 (approximately US$56 million). Around that time, Hillblom borrowed or withdrew several million dollars from DHLI, and through the 1990-92 transactions no interest or principal was repaid. Prior to his 1982 acquisition of Mattawan stock, it was understood that Hillblom had some form of interest in DHLI.

Po Chung also acquired 49 percent of Mattawan's stock, for which he was to contribute 70 percent of the DHLI stock. The employee trust of Mattawan held the remaining 2 percent of its stock. On December 20, 1982, Mattawan acquired 120,000 DHLI shares from DHLI, and on January 24, 1983, Mattawan acquired 49,900 DHLI shares from Po Chung and 99 from Helen Wong. After August 8, 1984, Mattawan held all but 1 of DHLI's shares. In 1989, Schwartz structured a sale of Hillblom's 49 percent Mattawan interest to Po Chung for US$226 million. The sale documents were dated December 31, 1989. During the transaction with the foreign investors, petitioner's lawyers advised that the sale would not be respected for U.S. tax purposes.

On January 15, 1982, the DHL shareholders entered into an agreement that provided that, in the event of the death of one or more of them, the deceased's "entire interest in the DHL business" would be transferred to the surviving DHL shareholders with appropriate compensation to the deceased's estate. The DHL shareholders apportioned the net proceeds from the sale of MNV and DHLI stock in 1990 and 1992, the assets of DHLI and MNV excluded from the sale, and other assets the DHL shareholders acquired with funds from DHLI or MNV as follows: Hillblom 55.4744 percent; Robinson 11.6788 percent; Allen 21.8694 percent; and Po Chung 10.9774 percent. The apportionment was not based on their respective stock ownership and the relative values of MNV and DHLI. Instead, it reflected the DHL shareholders' true economic arrangement. The DHL shareholders' negotiated apportionment of the proceeds was premised on the relative contribution each shareholder had made to the success of the DHL worldwide operation, although Robinson had made a concession to Allen to cause the deal to be consummated. This plan for apportioning the proceeds was based upon a longstanding agreement or understanding of the DHL shareholders.

According to the DHLI/MNV shareholders' agreement, Donnici, Lupo, and Schwartz were to receive $8,437,500, $8,437,500 and $2,953,125, respectively, from the proceeds of the 1990 and 1992 transactions. A portion of the DHL shareholders' proceeds was

used to purchase some of the DHL shares of DHL's minority shareholders. The DHL shareholders agreed that, for purposes of determining the amount to be paid for the minority shareholders' shares, DHL was worth one-third of the total offer for all three companies.

During the December 1990 through August 1992 period, before the foreign investors exercised their option, the DHL shareholders, through and as DHL directors, had veto power over the following actions by the boards of DHLI and MNV:

(1) Any change in the employment of Lupo, P. Y. Kuijpers, Robert Parker, and Errol Gates;

(2) any issuance of DHL shares or other related securities;

(3) any debt or lease financing by DHL, with certain exceptions for refinancings, lease financings below $3 million, and borrowings totaling less than $5 million;

(4) any material change to the business of DHL, except for a reasonable commitment of DHL's resources to development of heavy freight transportation capability;

(5) any change in DHL's auditors or accounting policy. During that same period, among others, the following actions were subject to supermajority (would require agreement of some board members controlled by the DHL shareholders) approval by the DHLI and MNV boards:

(1) Any amendment to the bylaws and memorandum and articles of association;

(2)  entering into a new business other than one that was directly related to the principal business of DHL;

(3)  reappointment of the CEO;

(4)  any debt or lease financing by DHL if, as a result of such financing, the total amount of debt and lease financing by DHL would exceed 75 percent of the total capitalization of DHL. The limit was 50 percent if the new investors exercised the "Newco Share Alternative";

(5)  any matters that exceeded a fair market value of $20 million, including purchases, sales, and leases, and excluding the exercise of the DHL trademark option.

## III.  Operating Agreements Between DHL and DHLI and Related Entities

The responsibilities of individual foreign operating companies were defined in network operating agreements with DHLI or Ops B.V, its subsidiary, and the responsibilities of the independent agents were defined in agency agreements with DHLI and related entities.  In general, an individual operating company or agent would bill customers in its service area an all-inclusive price for shipments to other service areas.  For transactions emanating outside the United States, each service area's operating company or agent typically retained a portion of the revenue received from its customers and remitted the remainder to the DHLI entities as a "network fee".

The network fee was intended to compensate DHLI for central facilities and services--including the air transportation network, clearinghouse hubs at air terminals, customs clearing services, know-how, insurance, and advertising--that DHLI provided for the benefit of the local operating companies and agents. Although DHL was DHLI's pickup and delivery agent in the United States and DHLI was DHL's pickup and delivery agent outside the United States, with extremely limited exceptions, no fees or costs were paid for those services exchanged between them until 1987.

Foreign operating companies and independent agents were required to use the DHL trademark so as to be identified as part of the DHL network. A trademark license was included as part of the agreements with the local operating companies and agents. The agreements with foreign local operating companies and agents generally did not require a separate payment for royalties. On occasion, it was necessary to include nominal royalty provisions in agreements with local operating companies and agents in order to comply with local law. Sometimes the royalties were credited against the network fee. The network fee remitted to DHLI and related corporations included payment for the capital infrastructure, operating expense, know-how, and sometimes a nominal amount for use of the DHL name provided by the DHL network.

A memorandum of oral agreement, dated March 15, 1974 (1974 MOA), reflected the agency agreement between DHL and DHLI. Under the 1974 MOA, DHLI acted as the foreign pickup and delivery agent for DHL, and DHL licensed the use of the name DHL to DHLI for the 5-year term of the 1974 MOA. The 5-year term of the 1974 MOA could be terminated by DHL on 90 days' notice. Upon termination of DHL and DHLI's relationship, under the 1974 MOA, DHLI could not use the name DHL or any similar name for a period of 5 years.

Between 1974 and 1990, the 1974 MOA was amended on six occasions. The first amendment provided (retroactively to 1974) that DHL and DHLI were each entitled to the revenues and were responsible for the expenses related to shipments originating in their respective service areas. The first amendment provided a procedure for selecting an arbitrator to arbitrate any disagreement concerning the allocation of revenues and expenses. Both parties consented to the jurisdiction of the U.S. District Court in Guam to enforce the arbitrator's decision.

On October 12, 1975, DHL and DHLI entered into the second amendment to the 1974 MOA which, in part, provided that costs and revenues of the parties' electronic data transmission business were to be shared as agreed or, if no agreement, based upon reasonable value of services, reasonable value of resources contributed, with the understanding that the customers DHLI served presently were the result of DHL's goodwill. DHLI again agreed that it would not use the name DHL or compete with DHL for

5 years after the termination of the agreement. The second amendment was for 5 years, and it incorporated and reaffirmed the terms of the 1974 MOA and the first amendment, including DHL's right to terminate the 1974 MOA upon 90 days' notice.

The third, fourth, and sixth amendments extended the term of the 1974 MOA through February 15, 1997. None of the amendments changed DHL's right (under the original 1974 MOA) to terminate on 90 days' notice. The fifth amendment provided that the relationship or agreement would "remain in full force and effect unless and until * * * disapproved by the United States Department of Transportation." Neither the 1974 MOA nor any of the six amendments provided for royalties for the use of the DHL trademark or the DHL name.

In connection with the involvement of the foreign investors, a December 7, 1990, agency agreement (1990 agency agreement) was entered into so that the arrangements between DHLI and DHL would be set forth clearly and completely in one document. Under the 1990 agency agreement, DHL had the exclusive right to use and sublicense the DHL trademark in the United States, and DHLI had the exclusive right to use and sublicense the trademark outside the United States. The agreement established reciprocal performance standards and financial covenants. Under the 1990 agency agreement, DHL or DHLI would compensate the other, at cost plus 2 percent, for its shipments in excess of those performed for the other. The 1990 agency agreement was terminable only for

cause and had a 15-year term, with an automatic 10-year renewal if the parties were reasonably satisfied. It did not contain DHL's right to terminate the agreement upon 90 days' notice and it did not provide for DHLI's payment of a royalty for use of the DHL trademark. DHL, DHL Airways, and a newly created entity, on August 18, 1992, entered into an agreement paralleling and keeping in force the 1990 agency agreement, essentially substituting a newly created entity for DHLI.

Upon termination of the 1990 agency agreement, DHLI would be prohibited from using the DHL trademark anywhere in the world for a period of 5 years. The 1990 agency agreement provided that the laws of New York governed its interpretation. It was signed by DHL and DHLI and filed with the U.S. Department of Transportation.

In addition to the 1974 MOA and amendments, DHL and DHLI in their cooperative effort to operate a worldwide DHL network entered into numerous written and oral agreements. Some of these included operational standards such as uniform service criteria for network performance (percentage of deliveries within an established time period, data retrieval standards), establishment of quality of service reporting criteria (systems and measures for network product volumes, pickup performance, and delivery performance), service directory format and content, development of quality control criteria for the network, and development of global air freight methods for handling larger or traditional air

cargo.  There were also agreements concerning customer service procedures, methods for taking and handling customer calls, booking shipments, responding to service requests, dealing with standard inquiries, managing large accounts, responding to complaints, and tracking or tracing shipments.  Similar operational standards existed for the network's ground operations, gateway operations, and hub procedures.  The 1990 agency agreement, in part, attempted to gather these procedures and agreements into a single document.

IV.  Development and Use of the DHL Trademark and Logo

During the early development of the delivery network, the "DHL" name was generally used, but no standard trademark or logo was used.  In the late 1970's, DHLI commissioned and paid for the design of the first standardized DHL logo, which was then used by the entire DHL network.  In later years, DHL and DHLI cooperated on a project to modernize the DHL logo and to develop a Corporate Identity Manual explaining the use of the redesigned logo, all of which was cooperatively funded.

Beginning in 1977, DHL began the process of registering the DHL trademark.  Several different trademarks or logos have been registered, including "DHL", "DHL Flyer", "DHL Worldwide Courier Express", and "DHL Worldwide Package Express".  DHL bore the cost for registering the DHL trademark in the United States.

Ops B.V. and DHLI entered into an agreement on August 13, 1979, stating:  (1) DHL was the "registered proprietor" of the

name "DHL" and used that name in its business in the United States; (2) DHLI licensed the name "DHL" from DHL and carried on business as a document courier on a worldwide basis; and (3) DHLI, with DHL's consent, appointed Ops B.V. as its agent to establish and improve the network throughout the world, excluding the United States. On November 15, 1980, DHLI and Ops B.V. executed a "Variation Agreement" modifying the 1979 agreement with DHL's consent.

Geoffrey Cruikshanks (Cruikshanks) was hired in 1982 as legal counsel for the DHLI portion of the DHL network. On August 1, 1983, Cruikshanks asked Lupo if DHL would sell DHLI the rights to the DHL trademark outside the United States. Lupo responded that the worldwide rights to the trademark could not be sold without DHL board of directors and shareholder approval, but the rights for DHLI to use the trademark only in Central America could be transferred for $100,000. DHL transferred the Central America trademark rights to DHLI for $100,000.

In 1983, Cruikshanks undertook a worldwide registration program of the DHL trademark. Although Cruikshanks had been advised in April 1983 by the DHL general counsel that the DHL name should be reflected in connection with the registrations worldwide, that was not done. Cruikshanks hired John Caisley (Caisley) to register the trademark. Caisley was not informed about the 1974 MOA and DHL's agreement with DHLI concerning the DHL trademark, and he registered it in DHLI's name in various

foreign countries. Caisley rendered an opinion regarding DHLI's ownership of the DHL trademark in December 1990 when he was not yet aware of the 1974 MOA and its amendments. The cost of these trademark registrations was borne by DHLI. DHLI protected the DHL trademark against infringement outside the United States. Outside the United States, DHLI also took responsibility and bore the cost of protecting the DHL trademark, including disputes with terminated agents relating to trademark usage.

The DHL name had been protected under U.S. trademark law since 1969 and the DHL logo since 1977. From 1978 until 1992, DHL or its subsidiaries were the registered owners of the DHL trademark in the United States, and they bore the costs of obtaining those U.S. registrations. In July 1986, an employee in the Argentina office asked a DHL employee for permission to alter the design of the logo used in Argentina. An MRI employee was asked to handle the matter, with the request that he direct each country manager to place next to the DHL logo a registration symbol showing that the logo was a registered trademark of DHL. In August 1988, DHL learned that the registrations of the DHL trademark outside the United States failed to reflect DHL's interest in the trademark and the agreement set forth in the 1974 MOA.

Margaret Phillips, an attorney in the Donnici law firm, and Cruikshanks discussed a revised trademark license agreement between DHL and DHLI setting forth DHL's ownership of the DHL

trademark and the practices and intent of the parties.  Margaret Phillips drafted an agreement in 1988 setting forth the understanding that DHL licensed to DHLI the right to use the DHL name and logo.  The agreement, although unsigned, contains acknowledgment that DHL owned the worldwide rights to the trademark and that DHLI obtained trademark registrations to be held in trust for DHL that DHLI would surrender to DHL upon termination of the license.  The unsigned 1988 agreement was provided to counsel for the foreign investors, with the statement that it represented the agreement of the parties during due diligence for the 1990-92 transaction.

As of July 1990, intranetwork memoranda contained the acknowledgment that DHL owned the worldwide rights to the DHL name and globally used trademark and trade name.  DHLI was exclusively licensed to use those marks outside the United States and, for the sole purpose of complying with trademark laws, could file trademark applications outside the United States as the "registered owner".  There was network-wide employee recognition that DHL was the source of DHLI's use of the trademark rights.

For some period of time prior to 1990, Cruikshanks held the personal view that DHLI owned the trademark outside the United States, even though he orally and in writing represented to the contrary.  During the negotiations with the foreign investors, questions arose about the trademark ownership outside the United

States because of DHLI's registration of the trademark in numerous foreign countries.

For purposes of the transactions between DHL shareholders and the foreign investors, the agreements reflected:

> [DHLI] obtains its rights to the DHL trademark from DHL Corp. and has obtained its registrations pursuant to such licence agreement.  An unwritten agreement exists between * * * [DHLI] and DHL Corp. which provides that upon the termination of the agency agreement between them, * * * [DHLI] will procure DHL Operations B.V. to assign all trademark registrations to DHL Corp. without consideration and at its cost.

The three companies, DHL, DHLI, and MNV, operated in harmony to protect and develop the DHL trademark.  In the mid-1980's, a Corporate Identity Manual was produced, setting forth standards for the DHL logo's use, including the typeset, colors, and letter size for each type of use.

DHL's advertising represented to the public that it was one global delivery company worldwide, and customers were made aware that their documents could be delivered anywhere in the DHL worldwide network.  Although advertising was accomplished separately for DHL and DHLI, in the mid-1980's, DHL's management specifically decided that brand awareness and marketing strategies should have local focus because the markets served were too dissimilar to support a global program.  Generally, DHL or DHLI each bore the cost of advertising for its respective market.  DHL and DHLI did not directly control the quality of the goods or services that the other provided.

From 1982 through 1992, DHL spent approximately $150 million for advertising, publicity, and promotion within the United States as follows:

| 1982 | $6,896,000 |
|------|------------|
| 1983 | 12,363,000 |
| 1984 | 14,473,000 |
| 1985 | 9,509,000 |
| 1986 | 11,870,000 |
| 1987 | 9,796,302 |
| 1988 | 11,474,000 |
| 1989 | 22,771,452 |
| 1990 | 19,880,000 |
| 1991 | 19,460,000 |
| 1992 | 15,740,000 |

From 1982 through 1992, DHLI, MNV, and subsidiaries spent approximately $380 million for advertising, publicity, and promotion outside the United States as follows:

| 1982 | $6,671,000 |
|------|------------|
| 1983 | 8,592,000 |
| 1984 | 14,933,000 |
| 1985 | 24,290,000 |
| 1986 | 32,340,000 |
| 1987 | 34,341,000 |
| 1988 | 37,045,000 |
| 1989 | 48,937,000 |
| 1990 | 47,460,000 |
| 1991 | 56,099,000 |
| 1992 | 70,140,000 |

The air express business is highly competitive, and consistency and reliability of service, and to a lesser extent delivery speed and price, engender customer satisfaction and loyalty. In order to provide consistently reliable service, an air express company must possess and maintain an extensive pickup and delivery network; an infrastructure of shipment facilities, planes, vans, and computer systems; tracking technology; and a

great deal of know-how and expertise. These components are of greater significance to customers than the name or trademark of the delivery entity. Generally, a delivery business' trade name or trademark will have less value when separated from the delivery infrastructure. On occasion, an established delivery company acquires another operating delivery company solely for its operating infrastructure, and the acquired company's name is phased out and/or discarded.

As part of the first stage of the transaction with the foreign investors, the parties agreed to a reservation of rights agreement in which an intermediate entity was used to transfer the DHL trademark to Newco (or DHLI Bermuda) and Elan Operations B.V. (Dutchco). The reservation of rights agreement provided that nothing contained in it shall be construed as an assignment or grant to the intermediate entity of legal or beneficial ownership in or to the trademark, it being understood that Dutchco is the owner of all right, title, and interest in and to the trademark in the United States, and that Newco is the owner of all right, title, and interest in and to the trademark outside the United States, in each case subject only to the rights reserved to the intermediate entity during a so-called reservation period and thereafter under a license period. Use of the DHL trademark by petitioner and its related domestic entities inured to the benefit of Dutchco and Newco, and the validity of trademark ownership was incontestable worldwide. While the

intermediate entity could grant DHL and DHL Airways the right to use the DHL trademark in the United States, it could not grant the right to use the DHL trademark to any other person or entity anywhere in the world.

In July 1990, there was an agreement in place between DHL and DHLI providing that, if the transaction with the foreign investors were terminated, DHLI could not use the DHL name outside the United States for 5 years.

V.  Financial Condition of DHL

During the 1980's DHL's principal competitors included Federal Express, United Parcel Service (UPS), and Airborne Express (Airborne), all of which were larger, had better economies of scale, and were in better financial condition than DHL.  In the early 1980's, Federal Express had an 80-percent share of the U.S. domestic overnight delivery market, and it did not regard DHL as a significant competitor.

In the early 1980's, however, DHL had 30-40 percent of the U.S. international outbound market.  Federal Express, which did not have or offer its own international line of business at that time, decided to expand into the European market.  Federal Express did regard the DHL network as the significant competitor in the European market because of DHL's existing network and ability to clear customs.  Federal Express failed to build a successful European delivery network and lost several hundred million dollars but continued to offer U.S. outbound service.

In 1983, DHL decided to increase its domestic coverage, both to protect its share of the outbound market and to handle more domestic shipments that could improve profitability and provide more potential for foreign outbound customers. DHLI management, however, was not in favor of DHL's domestic expansion plan. DHL's domestic expansion included the establishment of its own airline (DHL Airways), which was a capital-intensive and expensive method to ensure expansion capacity and more individualized and reliable schedules.

There were also additional capital expenditures for new locations, vans, couriers, and other equipment, which further strained DHL's cash-flow in the mid-1980's. Because Federal Express had an established comprehensive overnight delivery network, it had achieved the highest volumes and the lowest per-shipment costs, and as a result, the DHL expansion was insufficient to effectively compete. A bigger company with large volume and existing ground network, such as UPS, was better equipped to challenge Federal Express.

DHL bid low on a U.S. Government contract with the General Services Administration (GSA) to help fill its planes and help with the extra cost of expansion. Additional costs, however, were incurred under the GSA contract because the deliveries were not at consolidated locations but rather were to specific floors, offices, or desks. The low bid and added costs made the GSA

contract an additional burden on DHL's financial condition rather than helping to facilitate expansion.

In addition, DHL embarked on its expansion at a time when the U.S. overnight delivery market was becoming more competitive, especially because UPS had entered that market. Federal Express responded to the market forces by cutting prices, and U.S. market prices fell steadily during the period when DHL was trying to expand. Because of its expansion and the market forces, DHL experienced increased financial strains and severe cash-flow problems during the mid-1980's.

From 1983 through 1988, DHL's domestic volume increased sharply, and its domestic revenues also increased, although at a lower rate. Although DHL did achieve some reductions in its per-shipment costs, the cost of the expansion, price competition in the U.S. market, and DHL's failure to achieve the same economies of scale as its larger competitors caused DHL to sustain heavy losses, ranging from $5 million to $25 million per year. Some of the reasons for DHL's poor performance in its attempted domestic expansion were similar to Federal Express' poor performance in its attempted foreign expansion in attempting to compete with DHLI.

DHL's losses from 1983 through 1988 were attributable to its domestic business, not to its outbound business. During the same period as the domestic expansion and losses, DHL's outbound volume and revenues were steadily increasing. DHL experienced

consistent losses on internal domestic shipments and profits on its outbound shipments that originated domestically.

In 1986, DHL retained Bain & Co., Inc. (Bain), to advise it on how to return to profitability. Bain analyzed DHL's cost structure and, in 1987, developed a cost model specifically for DHL. Before that time, DHL did not specifically account for cost data by product line. Bain demonstrated that DHL's revenue from an outbound shipment was greater than that from a domestic shipment, and customer density in a coverage area was extremely important to profitability. Bain made recommendations based on these findings, many of which were implemented and had a positive impact on DHL's financial performance. In order to deal with the increasing debt, financial difficulties, and inability to enlarge or compete domestically, Bain recommended that DHL consider a merger with a company in the same industry.

DHL changed its business strategy during 1988, focusing more on outbound shipments and less on domestic expansion. The GSA contract was allowed to expire, more effective cost control programs were instituted, and by the late 1980's to the early 1990's, DHL started showing profits. The controlling shareholders began looking for a suitable company with which to arrange a merger.

VI.  Negotiations With UPS

From late 1986 through early 1988, DHL and DHLI negotiated with UPS concerning a potential merger.  UPS was seeking to gain access to the operational portion of the DHL network outside the United States.  UPS sought to accomplish that by purchasing all of the stock; subsequently, however, it focused on a purchase of the assets of DHLI, MNV, and DHL.  UPS showed little interest in the DHL trademark, and no attempt was made to value the DHL trademark for purposes of the negotiations.  It was UPS' intent to phase in its own name and phase out the DHL name over a transitional period extending about 1-3 years beyond acquisition.

In 1987, UPS made a "final offer" of approximately $330 million for most of the assets of the DHL companies (excluding certain "carved out" assets that UPS did not wish to acquire).  UPS did not agree to assume any liabilities in connection with this offer.  The DHL trademark was included in the assets that UPS proposed to acquire.  Including the carved-out assets, UPS' offer would have been approximately in the $450 to $500 million range.  The negotiations with UPS broke down and failed primarily because the parties could not agree on price.

VII.  1990-92 Transaction With Foreign Investors

On December 21, 1988, a group of foreign investors made their first generalized offer.  Ultimately, the foreign investors were Japan Air Lines Co., Ltd. (JAL), Nissho Iwai Corp. (Nissho Iwai), and Deutsche Lufthansa Aktiengesellschaft (Lufthansa).

JAL and Lufthansa are large, partly government-owned airlines. The foreign investors were interested in integrating their airline business with the DHL international delivery network. Initially, JAL and Nissho Iwai were interested in acquiring a stock and/or asset interest in the DHL network entities, including the DHL trademark. After extensive negotiations and the entry of Lufthansa into the dealings, on December 7, 1990, JAL, Lufthansa, and Nissho Iwai acquired a 12.5-percent stock interest in DHLI and MNV, an option to purchase an additional 45-percent stock interest to achieve a collective controlling interest in those entities, and a 2.5-percent stock interest in DHL. As of August 18, 1992, the foreign investors exercised their stock purchase option.

DHL, DHLI, their shareholders, and the foreign investors were represented in the negotiations by tax, merger and acquisition, corporate, and other specialized attorneys, investment bankers, accountants, and advisers. Hillblom was the principal shareholder who was most prominent in deciding the terms in the negotiations with the foreign investors. The foreign investors' due diligence investigation was comprehensive and intensive with respect to the DHL companies' finances, operations, and assets.

The December 21, 1988, offer was made by two of the foreign investors (JAL and Nissho Iwai) to purchase up to 80 percent of the combined DHL network. The offer did not contain a purchase

price and was conditioned on satisfying the U.S. Department of Transportation requirement that no more than 25 percent of DHL be foreign owned. Counsel for the foreign investors were also aware that a sale of DHL's assets, including the trademark, for less than their fair market value could generate legal repercussions caused by minority shareholders or creditors. Allen, Po Chung, Robinson, and Hillblom did not want to divest 100 percent of their interest in the DHL entities. Hillblom, in particular, wanted to continue his interest in the resulting enterprise.

JAL and Nissho Iwai concluded, before making an offer, that the combined value of DHLI and MNV was $450 million. Before determining that value, JAL and Nissho Iwai examined valuations by independent financial advisers and a market forecast by Arthur D. Little, Inc. On June 14, 1989, JAL and Nissho Iwai sent a letter of intent to the selling shareholders, offering to purchase not less than 60 percent of the stock or net assets of DHLI and MNV at a price based on the $450 million value for a 100-percent interest. The letter of intent indicated that the foreign investors would not acquire an interest in $80 million of DHL's class B common stock held by DHLI.

The foreign investors retained Coopers & Lybrand (Coopers) to prepare a report on the DHL operations, including DHL, MNV, and DHLI. The report, dated May 31, 1989, was based on information furnished by employees and representatives of the DHL entities, both through documents and in meetings and interviews.

As part of the report, Coopers advised JAL that if common control of DHL, DHLI, and MNV existed, the Internal Revenue Service (IRS) might seek to impute a royalty for DHLI's use of the DHL trademark. Also, because of concerns about DHL's weak capitalization and lack of profits, Coopers recommended the infusion of equity capital into DHL while safeguarding it from transfer pricing problems. Coopers stated that no royalty should be charged DHL for continued use of the DHL trademark and that such a royalty would make it more difficult for DHL to achieve profitability. Coopers also noted that a 2-percent royalty might be imputed to DHL for its royalty-free license to DHLI.

The foreign investors also wanted to ensure that DHL would continue to be a cooperating and effective component of the DHL network. They were also concerned about the possibility that DHL could experience financial difficulties or could be acquired by a competitor, and in that regard they wanted to control the DHL trademark, which they considered to be a valuable strategic asset. The DHL network was the main focus of the foreign investors.

During May 1989, in accord with its advisers' recommendation, JAL decided not to acquire more than a 20-percent equity interest in DHL to minimize JAL's exposure to risks, including those that could occur with respect to U.S. taxation. The buyers' and sellers' representatives were aware of and discussed concerns that DHL could be exposed to liability, tax

and otherwise, for royalties due from DHLI for prior use of the DHL trademark.  It was estimated by the sellers' representatives that the possibility of an imputed royalty could fall in the range of 4 to 6 percent of DHLI's annual gross revenues.

It was at a May 10, 1989, meeting that the sellers' representatives proposed using the purchase of the DHL trademark as a vehicle for capitalizing DHL.  It was proposed that any gain on the trademark sale could be offset by DHL's net operating losses and that DHL could license the trademark from JAL and pay royalties, and DHL's taxable income could thereby be reduced.

The foreign investors retained the assistance of an investment banker, Robert Fleming & Co., Ltd. (Fleming), and in February 1989, Fleming prepared a preliminary draft report concerning valuation.  Fleming placed a value ranging from $600 million to $1.3 billion on the global DHL business, depending on the methodology.  Fleming also estimated that a prospective purchaser could expect to pay a premium of 40 to 45 percent to gain control.  Fleming indicated that the DHL name, while intangible, does have a value that the vendors would expect to see reflected in the price.  Fleming also suggested that the selling shareholders might demand additional consideration for the value of the DHL trademark in the range of 10 to 15 percent of the DHLI/MNV stock price.  After a more complete due diligence, Fleming issued a second report dated June 9, 1989, which determined that DHLI and MNV had a value in a range from

$392.2 to $680.4 million and that a control premium of 40 percent of the purchase price was appropriate.  Peers & Co. (Peers), which advised JAL, produced its report dated June 9, 1989, determining that DHLI/MNV had a value ranging from $522 to $580.9 million and that a control premium of 40 to 60 percent of the purchase price was appropriate.

During December 1989, the foreign investors' objectives were to gain collective control of DHLI and MNV, recapitalize DHL, and insure DHL's future financial viability.  On June 14, 1989, the foreign investors sent letters of intent, offering to purchase the trademark for $50 million, subject to further evaluation by the parties, and not less than 60 percent of the stock in DHLI and MNV based on a $450 million value.  JAL recognized that by owning the DHL trademark it could gain some control over DHL's activities by including in any license agreement provisions preventing DHL from engaging in economically irrational conduct. DHLI would also be protected from DHL's terminating the agency agreement.  On June 21, 1989, the DHL shareholders advised JAL and Nissho Iwai, in writing, that although they did not agree to all the terms in the June 14, 1989, letter, they remained enthusiastic, and that further financial negotiations were necessary.  The DHL shareholders' main concern was price.

JAL commissioned Arthur D. Little, Inc. (Little), a consulting firm, to conduct a market study for its negotiations. Little's March 31, 1989, report projected growth in the small

package sector of the air cargo market between 1987 and 2000, depending on the geographical market.

During June 1989, Nicholas Miller (Miller) of Coopers, who was assisting JAL and Nissho Iwai, prepared a rough estimate to illustrate a conceivable value for the DHL trademark outside the United States.  Miller arrived at a $25 million estimate, which was provided to the foreign investors, who considered the information in their evaluation of the transaction.  In reaching that estimate, Miller believed that the value of DHL's trademark rights was diluted by the agreements between DHLI and DHL and DHLI's rights and use.  Miller's $25 million estimate was based on the assumptions of $250 million of capital invested and pre-tax operating profits of $80 million.  He then used a 30-percent return on capital, or $75 million, leaving a premium of $5 million, which he extended for 5 years to reach a $25 million estimate.  The foreign investors viewed DHLI as having the right to use the DHL trademark during the current term of the mutual agency agreement without additional cost.

In July 1989, Schwartz questioned the impact of the DHL trademark value on DHL's tax position.  DHL shareholders had proposed a $100 million value for the trademark.  JAL and Nissho Iwai decided that they would offer $50 million to DHL for the dual purpose of purchasing DHL's trademark rights and infusing capital into DHL.  In their decision to make this offer, JAL and Nissho Iwai considered DHL's need for capital and had considered

their advisers' reports and advice. The $50 million offer was part of a letter of intent to DHL, offering to purchase the worldwide DHL trademark.

JAL and Nissho Iwai initially thought that the DHL trademark should be transferred to an entity owned by them, but they were also agreeable to the DHL trademark's being owned by an entity in which the selling shareholders retained an interest, if the sellers bore a proportionate share of the $50 million purchase price.

On June 21, 1989, the DHL shareholders advised the foreign investors of their disagreement with some of the terms of the letter of intent, and the price offered by the foreign investors was the key issue concerning the DHL shareholders. After that, the parties began negotiating a joint venture arrangement where the DHL shareholders would retain a 40-percent interest in DHLI and MNV. Additionally, Hillblom wanted to retain an interest in the DHL trademark if the joint venture arrangement were implemented, and he wanted to retain an interest in DHLI and MNV because of concern about future stock value if he relinquished control.

During discussions of a joint venture between the DHL shareholders and the foreign investors in July 1989, the DHL shareholders advised that they wanted a put with a floor for their minority share, and they refused to grant JAL and Nissho Iwai a call on the remaining 40-percent interest, but they were

willing to accept the initial price if they could share in the benefits of mutual affiliation by deferring the sale of a significant minority interest and enhance its value.

In July 1989, JAL's and Nissho Iwai's advisers estimated that at least one-half of DHL's value was attributable to the agency agreement and the goodwill of the DHL trademark. In late August 1989, JAL's and Nissho Iwai's advisers were advising that unless they increased the purchase price, the transaction would not be consummated.

On September 14, 1989, Peers produced a revised report, valuing a 100-percent interest in DHLI/MNV at $625 to $700 million. In late September 1989, the parties discussed placing the foreign investors in a supermajority position on the boards of DHLI and MNV, and other provisions were devised to protect the DHL shareholders' resulting minority interests against the foreign investors' collective majority position.

On September 28, 1989, JAL and Nissho Iwai extended an offer to acquire a 60-percent interest in DHLI/MNV based on a $450 million valuation of those companies, which was rejected by the DHL shareholders. During late September 1989, the DHL shareholders asked for a price based on values of at least $500 million for the DHLI and MNV stock and $100 million for the DHL trademark, which the foreign investors rejected. The DHL shareholders stated that the parties were so far apart that

further negotiation at that time was useless, and the negotiations ceased. The negotiations resumed late in 1989.

Nissho Iwai, without JAL, approached the DHL shareholders in October 1989 to see if they would sell control of DHLI/MNV for a purchase price based upon a total value for the entities of $670 million. The DHL shareholders reacted favorably. JAL objected to Nissho Iwai's actions. Also in October 1989, Peers suggested to JAL that it purchase a 25-percent interest in DHLI/MNV. Peers advised that if JAL wanted a controlling interest, it would have to increase the purchase price to $650 million for DHLI/MNV and the DHL trademark with a 1-percent royalty.

On October 19-20, 1989, Hillblom and Mitsuo Ando (a JAL principal) reached an understanding, which they recommended to their colleagues, under which JAL would purchase 50 percent of DHLI/MNV, Nissho Iwai would purchase 10 percent, and the DHL shareholders would retain 40 percent, based on a $450 million value of DHLI/MNV to determine the purchase price. JAL then advised that it would agree to the above terms only if it received control of the boards, and Hillblom rejected that offer. JAL then suggested buying, with Nissho Iwai, a 39-percent interest in DHLI/MNV.

Hillblom believed that for control (51 percent or more) of DHLI/MNV, the purchase price had to be based on a valuation of $600 million or more; for less than control, the purchase price could be based on a valuation of $500 million. Allen strongly

opposed the 39-percent offer.  Historically, decisions were made by unanimous vote of the DHL shareholders.  The DHL shareholders, especially Allen, were concerned that Hillblom was negotiating without their consent.

On November 7, 1989, JAL and Nissho Iwai offered to purchase up to 40 percent of DHLI and MNV and the DHL trademark for a total price based on $500 million, with $50 million for the trademark.  On November 20, 1989, the DHL shareholders advised that they would sell 30 percent of DHLI and MNV and the DHL trademark for a price based on a $500 million valuation.  At that price, the DHL shareholders refused to grant JAL an option to acquire more shares, and JAL and Nissho Iwai would pay their pro rata share of the $50 million for the DHL trademark.

Around December 1989, JAL informed the DHL shareholders that the DHL trademark could be sold for $50 million to an entity in which the selling shareholders could retain a majority interest. Another basic understanding was that the foreign investors could acquire an interest in DHLI and MNV, but no single investor could acquire more than 50 percent.  About that time, Lufthansa entered the negotiations, and it was made aware that the price was not subject to change.  Lufthansa was advised that the $50 million payment to DHL for the DHL trademark had been set based on DHL's need for capital.  Lufthansa's counsel understood that the $50 million amount was not based on any appraisal or valuation of the DHL trademark.

On December 1, 1989, the DHL shareholders made an offer by which JAL and Lufthansa could each purchase 25 percent of DHLI/MNV, Nissho Iwai could purchase 7.5 percent, and the DHL shareholders would retain 42.5 percent. JAL, Nissho Iwai, and Lufthansa accepted. The memorandum of understanding for the sale of DHLI/MNV shares to JAL and Nissho Iwai, executed in December 1989, provided for the purchase of shares as stated above (25 percent/25 percent/7.5 percent) at a price based upon a $450 million value of DHLI/MNV. DHL would sell the DHL trademark to the postalliance entity for $50 million, depending on the tax effect, and receive an exclusive royalty-free license for the use of the DHL trademark in the United States. The foreign investors were interested in an asset acquisition to minimize their exposure to liabilities from DHL's past tax history. In a meeting with the DHL representatives during January 1990, JAL and Nissho Iwai representatives stated that one of their objectives was to establish a new structure for DHLI/MNV to minimize any such exposure. Also, in a January 1990 meeting among the parties' representatives, the issue arose of whether the trademark sale could be considered a sale for $50 million plus the value of the 15-year royalty-free period, which could constitute additional income to DHL (the Alstores problem).

On February 23, 1990, the parties drafted a supplement to reflect the addition of Lufthansa to the transaction. First Boston Corp., investment bankers retained by Lufthansa, valued

DHLI/MNV at $400 to $600 million. It valued the DHL trademark at $100 to $200 million.

The foreign investors initially understood that DHL owned all rights in the DHL trademark throughout the world. As their due diligence progressed, however, they became aware of certain inconsistencies, including the registrations of the DHL trademark in DHLI's name throughout the world. The foreign investors never resolved these inconsistencies concerning the DHL trademark. Ultimately, it was agreed that, if the foreign investors exercised their stock purchase and trademark options, DHL would transfer all its rights in the trademark, including those it may have within and without the United States.

DHL's lenders consented to a trademark option agreement, but only on the conditions that: (1) DHL would "receive full value (as determined on an arms length-transaction basis) for the assets it transfers pursuant to * * * [that] Agreement"; (2) DHL would receive at least $50 million as consideration for the DHL trademark or as additional equity investments; and (3) DHL would receive a 15-year royalty-free license to use the DHL trademark. After the 15-year royalty-free period, DHL would have to pay .75 percent of its gross sales as a royalty for use of the DHL trademark. In a communication dated as late as May 10, 1990, DHL's legal representative was representing to the lenders that DHL owned the trademark and licensed it to DHLI.

At a time when the total price for the transaction had been fixed and the amounts to be allocated or assigned to various aspects were being negotiated, the foreign investors' representatives were concerned about the bona fides of the transaction and that the amounts assigned to various assets were properly determined for tax purposes. There was concern that the focus had been on a $50 million cash infusion into DHL and not on the price, value, and/or tax attributes of the trademark aspect of the sale.

The DHL shareholders and their representatives were concerned about the tax implications of selling the United States and worldwide rights to the DHL trademark. DHL's representatives expressed the wish to the foreign investors' representatives that the amount received for the trademark be minimized. One suggested approach to accomplish that was to form a Dutch holding company. The new entity would transfer the foreign DHL trademark rights to the holding company after purchasing them from DHL for $10 million in return for a majority interest in the holding company. DHL would also transfer the domestic DHL trademark rights to the holding company in return for a minority interest. The foreign investors did not agree to this approach, but they would consider a new or other proposals. Detailed and protracted negotiations ensued among the parties' legal representatives, and several alternatives were proposed and discussed.

On March 23, 1990, Hillblom met with JAL and Lufthansa principals to restructure the transaction into two steps. In the first step, JAL and Lufthansa would each purchase a 5-percent interest in DHLI/MNV, and Nissho Iwai would purchase a 2.5-percent interest. JAL and Lufthansa would each be granted an option to purchase up to 25 percent of DHLI/MNV, and Nissho Iwai would be granted an option to purchase up to 5 percent. DHLI would be granted an option to purchase the DHL trademark, exercisable when the foreign investors exercised the option to purchase the additional DHLI/MNV shares. The foreign investors would receive current board representation based upon the number of shares they would own after the options were exercised.

On April 20, 1990, DHL's representative presented a structure to the foreign investors for the transfer of the DHL trademark in an attempt to minimize the tax effects. The original memorandum of understanding set a price of $50 million for the DHL trademark, and under the proposed structure the foreign investors would contribute $28.75 million and the DHL shareholders would contribute $21.25 million. DHL's representative proposed the following structure: before the execution of a binding contract of sale between DHL and the foreign investors, the current agency agreement would be extended for 15 years, including the royalty-free license to DHLI; in the new agency agreement DHL's right to terminate at will would be eliminated; and upon DHLI's exercise of its trademark option, DHL

would sell to DHLI an interest in the non-U.S. rights to the DHL trademark. DHL would also sell to DHLI the U.S. rights to the DHL trademark, to be encumbered by the 15-year royalty-free license to DHL. Both royalty-free licenses, as well as the elimination of DHL's right to terminate the agreement at will, could reduce the value of the DHL trademark sold by DHL. The value of the rights sold was to be determined by an appraiser but would be valued as encumbered. The transfer of the DHL trademark from DHL to DHLI followed this basic structure.

On April 27, 1990, DHL's representative indicated that an appraisal of the DHL trademark would have to be obtained in order to set the exercise price. Because the transaction was taxable to DHL, the representative did not want the exercise price to exceed fair market value, and he noted that the DHL trademark would be encumbered at the time the option was granted by reciprocal long-term royalty-free licenses to DHLI and DHL, and the trademark should therefore be diminished in value.

The July 9, 1990, trademark option agreement provided that, upon exercise of DHLI's option to purchase DHL's trademark rights, DHL would "retain an interest in the [DHL] Trademarks in the form of a fifteen-year royalty-free license to use the Trademarks in the United States". At the time the trademark option agreement was signed, the parties were still working on a form of trademark license. Although there were drafts of a trademark license agreement and negotiations concerning a license

agreement, no trademark license agreement was ever executed by the parties.

Ultimately, the parties entered into a reservation of rights agreement, dated as of September 17, 1992, under which a DHL company ultimately conveyed: (1) The U.S. rights in the DHL trademark to Dutchco, a Dutch subsidiary of DHLI Bermuda; and (2) the non-U.S. rights in the DHL trademark, to the extent that DHL or DHL Airways owned any such rights, to DHLI Bermuda (Newco). Pursuant to that agreement, DHL retained the right to use the DHL trademark in the United States without payment of royalties until September 17, 2007, and if the 1992 agency agreement was renewed, Dutchco would give DHL an exclusive license to use the DHL trademark in the United States for 10 years, at a royalty of .75 percent of gross sales.

The selling shareholders arrived at a $20 million value on DHL's trademark rights. The parties agreed that Bain, who was familiar with DHL and DHLI from prior engagements, would do the appraisal.

DHL's legal representative in the transaction was responsible for obtaining the valuation of the DHL trademark from Bain. Bain stated that it was asked to value the DHL trademark on the assumption that it would be conveyed to Newco on a 10-year royalty-free basis. On May 21, 1990, Bain began its analysis of the value. On May 23, 1990, 2 days after Bain began its valuation of the DHL trademark, it sent a draft letter stating

that Bain could provide some comfort on the issue before it and that the 1990 value of the right to the DHL trademark in the United States 15 years after the transaction was $20 million. DHL's legal representative noted that Bain should value both U.S. and the foreign rights to the DHL trademark and that they should be valued currently but as encumbered by the 15-year royalty-free license of the international rights from DHL to DHLI and the 15-year royalty-free license of the U.S. rights from DHLI to DHL.

Petitioner's representatives had some doubt about Cruikshanks' view that DHLI owned the foreign rights to the DHL trademark. In a July 3, 1990, memorandum to Bain, DHL's legal representatives explained DHLI's potential ownership rights in the DHL trademark and Cruikshanks' view that DHLI owned the foreign rights to the DHL trademark. Bain's valuation took into consideration DHLI's possible ownership rights. Bain appraised the trademark rights to be conveyed from DHL to DHLI at $20 million as of July 9, 1990. There is some confusion as to whether Bain's valuation is a current value or a present value of a future interest.

The trademark option agreement gave DHLI an option to purchase the trademark rights of DHL only if the foreign investors first acquired a controlling interest in DHLI. The final trademark purchase and sale agreement, dated as of September 17, 1992, allocated the $20 million option price at $17 million for the transfer of certain U.S. trademark rights to

Dutchco, subject to the reservation of rights agreement, and $3 million to a quitclaim of DHL's interest in the non-U.S. trademark rights in favor of Newco.

The overall transaction with the foreign investors was to occur in two phases, so that the foreign investors would initially have a minority of the shares with control of 7 of the 13 seats on the boards of DHLI and MNV in order to learn more about the DHL network and consider the operational synergy before deciding to acquire majority interests in DHLI and MNV. JAL and Lufthansa could each appoint three board members, and Nissho Iwai was entitled to appoint one board member. The remaining six members of the board were to be appointed by the DHL shareholders. The number of board members to be appointed by the foreign investors was dependent upon whether each of them exercised its option to acquire additional ownership in DHLI/MNV in the second phase of the transaction. The foreign investors were also entitled to appoint 2 of the 11 board members of DHL, the remainder being appointed by the DHL shareholders. Under a share pledge agreement, dated December 7, 1990, Po Chung, Robinson, Hillblom, and Allen and/or their entities holding stock on their behalf, pledged their DHLI and MNV stock holdings to secure their obligations and liabilities to the foreign investors.

On December 7, 1990, under the amended share purchase and option agreement, the foreign investors acquired 12.5 percent of

the stock of DHLI and MNV for $53,125,000 in cash and 2.5 percent of the common stock of DHL for $3,125,000 in cash. The $56,250,000 combined purchase price represented 12.5 percent of $450 million, without considering the $3,125,000 allocated to the DHL stock. Of the 12.5-percent stock holdings in DHLI and MNV, JAL was to receive 5 percent, Nissho Iwai 2.5 percent, and Lufthansa 5 percent. There was no assurance in December 1990, however, that the foreign investors would exercise their options to acquire a controlling interest in DHLI when they acquired their initial 12.5-percent interest in DHLI and MNV. If the foreign investors had not been able to, or had chosen not to, exercise their option to acquire a controlling interest in DHLI and MNV, they would have had no right to recover the money they paid for their initial 12.5-percent interest in DHLI and MNV.

In the second phase of the transaction, the foreign investors had an option to purchase, in similarly divided portions, an additional 45-percent interest of DHLI and MNV (for 45 percent of $450 million or $202,509,000). The foreign investors also had the Newco alternative, involving the reorganization of DHLI and MNV into a single entity. Under the Newco alternative, each of the foreign investors would contribute the difference between the amount already paid for the 12.5-percent interest and an amount that would give JAL and Lufthansa a 25.001-percent interest and Nissho Iwai a 7.5-percent interest in Newco. DHLI would contribute, with certain exceptions, all

its assets to Newco, the MNV shares would be contributed to Newco, and Newco would transfer its remaining 42.498 percent of its shares to the DHL participants, which included the controlling shareholders of the DHL network.  The net economic result of the DHLI/MNV or Newco options was substantially identical, and in either event the foreign investors would provide $283,634,000 in cash and obtain a 57.502-percent interest in DHLI/MNV.  Ultimately, the Newco approach was used, and its structure and the entities involved were changed several times before the transaction was consummated, but the net economic effect remained the same as outlined above.  An August 18, 1992, agreement contained the final version of the Newco transaction, and its terms are outlined, along with a diagram to show the steps, in the appendix to this opinion.

As of June 7, 1992, the foreign investors exercised their option to use the Newco alternative to acquire the assets of DHLI and MNV subject to the liabilities of each entity.  Thereafter, the foreign investors, together, owned a majority (57.5 percent) of the stock of DHLI Bermuda (the successor to DHLI and MNV) and collectively appointed a majority of its board of directors, which governs by majority vote.  On September 17, 1992, DHL's assignee, conveyed to Newco DHLI's interest in the non-U.S. DHL trademark.  The board of directors of Newco was to be composed of six members, of whom one would be appointed by JAL, a second by Nissho Iwai, a third by Lufthansa, and a fourth by the DHL

shareholders. The remaining two directors were to be appointed by vote of the other four directors. The JAL and Lufthansa directors were each entitled to three votes; the Nissho Iwai director, one vote; the DHL shareholders' director, five votes; and the resident directors, one-half vote each.

Around the time the second phase of the transaction was being completed, DHL's representatives became concerned about a tax-related issue denominated the "Alstores problem" because of the holding in Alstores Realty Corp. v. Commissioner, 46 T.C. 363 (1966). To avoid the problem, DHL's representatives proposed several alternative approaches to conveyance of the DHL trademark. Each alternative involved the present conveyance of non-U.S. rights and the retention of U.S. rights to the trademark by DHL for 15 years with a mechanism that permitted DHLI to obtain ownership of U.S. rights if DHL did not maintain certain minimum net worth requirements or on the happening of certain other events. Each alternative contemplated payment of $20 million, even though complete transfer of U.S. rights was not to be for 15 years. One of the foreign investor's representatives, responding in the negative to the proposal, explained that the transfer of the trademark was to protect the right and interest of the foreign investors from unexpected situations, such as a takeover of DHL by its competitors. He further advised that the foreign investors had no inclination to accept any of the alternatives proposed unless it not only satisfied the DHL

shareholders' request to save taxes on DHL but also protected the foreign investors.

Another representative of the foreign investors rejected the proposal and noted that the foreign investors expressed their willingness to be flexible in considering adjustments to the form of Newco's ownership if such adjustments would assist DHL in its tax planning without sacrificing a key element of the business deal.

During the period December 1990 to August 1992, the foreign investors occupied their positions on the boards of DHLI and MNV and acted in the roles of directors. The management of DHL, however, was maintained with the staffing that it had prior to the 1990 transaction. The foreign investors did not participate in the day-to-day management of DHLI and MNV in that period, although an employee of JAL and, on occasion, a few employees of Lufthansa worked in the Brussels office. There was also an Executive Committee of the board, consisting of one director appointed by each of the foreign investors and of the DHL and DHLI CEO's. The Executive Committee's purpose, however, was to implement decisions of the board.

The reservation of rights agreement (RORA) reserved to petitioners the exclusive right to use the trademark in the United States in the door-to-door package delivery business for 15 years, subject to: (1) Quality control provisions; (2) a termination clause that provided for termination if the agency

agreement was terminated; (3) petitioners' exercising reasonable diligence to prevent infringement; and (4) prompt notice of infringement. Petitioners had no right to decide whether to bring an infringement action. If an infringement action was brought, petitioners had to cooperate completely, had to prosecute the action, and had to bear the cost thereof unless Dutchco elected to control the action. Petitioners further covenanted that they would use their best efforts to promote the trademark, that they would not register any of the trademarks or any similar trademark in the United States or any other nation, and that they would not use the trademark of any competitor or use the DHL trademark in any way not authorized by the RORA.

The RORA imposed quality controls on DHL's manner and use of the trademark, and DHL could be required to change its manner and use. After the RORA was executed, DHLI decided issues relating to the use of the DHL trademark. The RORA granted petitioners a license to use the DHL trademark for 15 years royalty free. After the 15-year period, the RORA called for a royalty of .75 percent of DHL's gross sales for its delivery business. Of the $20 million price for the DHL trademark, representatives for DHLI and DHL allocated $17 million to the U.S. rights and $3 million to the non-U.S. rights.

VIII.  The Imbalance and Transfer Fees

DHL shipments of domestic origin to foreign destinations to be delivered through DHLI were termed "outbound" shipments.  DHLI shipments of foreign origin to domestic destinations to be delivered by DHL were termed "inbound" shipments.  Shipments of foreign origin with foreign destinations, but which passed through the United States and were handled by DHL, were termed "transfer" or "transit" shipments.

Before 1983, actual imbalances of shipments were not tracked or reported by either DHL or DHLI/MNV.  In December 1983, however, the DHL board recognized the need to examine the ratio of U.S. inbound to outbound deliveries, as well as the need for further study of the allocation of air transportation costs for on-forwarding of international shipments between U.S. points and a comparison of corresponding international on-forwarding of U.S. shipments.  Before 1987, neither DHL nor DHLI was compensated if the outbound or inbound shipments exceeded one another.  Likewise, before 1987, DHL received no compensation for handling transfer shipments.

In a 1988 amendment to the 1974 MOA, provision was made for a cost plus 2 percent compensation on the imbalance of shipments (imbalance fee).  DHL's system of determining imbalance shipments and applying cost plus a percentage markup was modeled after the system used by postal authorities throughout the world.  The imbalance fee was implemented for the taxable year 1987 and

forward, although only costs were paid for 1987. The imbalance fee was calculated by netting the inbound and outbound shipments and applying the cost plus 2 percent markup to the difference. The imbalance cost factor was each company's average cost of delivery of packages of any weight and size within its respective territories, determined annually. The imbalance fee was calculated using shipment units without considering the weight of any particular shipment.

In 1987, the U.S. Department of Transportation (DOT) questioned whether the memorandum of agreement, as it existed before 1987, adequately compensated DHL for the services performed by DHL for DHLI/MNV. During due diligence for the 1990 and 1992 transactions, DHL management expressed doubt that the cost plus 2 percent markup adequately compensated DHL for its services to DHLI/MNV. Coopers also questioned whether the cost allocation system accurately reflected the costs incurred by DHL in delivering shipments for DHLI/MNV.

On average, more than one-third of the DHL network's international shipments emanated from or were delivered in the United States, not including shipments that DHL transferred for DHLI/MNV in transit from one foreign locale to another.

The DHL cost information models used to calculate the imbalance fee and the transfer fee were developed by Bain in 1987 and were denominated "Product Line Profitability" (PLP) models. DHLI also employed a model that was developed by Bain in 1989.

Based on available data for the years 1984 through 1986 (before development of PLP), it was determined that DHLI suffered an imbalance of 65,000 shipments in 1984, an imbalance of 496,000 shipments in 1985, and an imbalance of 333,000 shipments in 1986.

The net imbalance of shipments for 1987 through 1992 was as follows:

| Year | DHLI's Shipments In Excess of DHL's | DHL's Shipments In Excess Of DHLI's |
|------|-----------------|-----------------|
| 1987 | 452,439 | --- |
| 1988 | 458,423 | --- |
| 1989 | 343,342 | --- |
| 1990 | 18,774 | --- |
| 1991 | --- | 162,746 |
| 1992 | --- | 212,127 |

For 1989 through 1992, the following table shows the reconciled shipment imbalances between DHL and DHLI:

| Year | Shipments from DHL to DHLI | Shipments from DHLI to DHL | DHLI's or (DHL's) Net Imbalance |
|------|------------------|------------------|-----------------|
| 1989 | 5,795,812 | 6,139,154 | 343,342 |
| 1990 | 6,742,804 | 6,761,578 | 18,774 |
| 1991 | 7,155,582 | 6,992,836 | (162,746) |
| 1992 | 7,888,518 | 7,676,391 | (212,127) |

Shifts in the imbalance were expected at the time the imbalance fee formula was negotiated.

The imbalance suffered by DHLI grew each year from 1991 through 1996. The imbalance fee negotiated between DHL and DHLI and included in the 1988 agency agreement was used in the 1990

and 1992 agency agreements, after the foreign investors became involved in DHLI, and continued through the time of trial.

A costing model (with the acronym "PRISM") developed by Bain for DHLI is used for pricing, budgeting, and planning purposes and is also used in the imbalance fee calculation between DHLI and DHL. For 1991, DHLI computed its per-unit cost of delivering documents and dutiable parcels from DHL at $10.59 and $30, respectively. For 1992, the document and dutiable parcel delivery costs were $10.49 and $28.70, respectively.

The actual weighted average costs, including the 2-percent markup used by DHL for 1990 and DHLI for 1991 and 1992, were $10.19, $15.25, and $15.25, respectively. The 1988 amendment also provided for a cost plus 2 percent payment to DHL for its cost of handling transfer shipments. DHLI paid this transfer fee to DHL, and DHLI did not perform a similar function for DHL. Before 1987, DHL paid a fee to DHLI for delivery of outbound shipments to certain remote or higher cost destinations (on-forwarding fee). The on-forwarding fee was charged to DHL to cover DHLI's cost of delivering shipments from the first international gateway to approximately 10 remote or higher cost destinations.

The transfer cost factor was computed annually as DHL's average cost of handling a transfer shipment. For 1987, DHL received its costs without the 2-percent markup for the transfer shipments. The on-forwarding fee was eliminated after 1986. The

transfer fee was determined by multiplying the estimated number of transfer shipments by DHL's average cost of handling such a shipment, and (beginning in 1988) by adding a 2-percent markup to average cost. Before 1987, DHL and DHLI/MNV did not employ any method to determine the average cost per shipment or the volume of transfer shipments. From 1987 through 1990, the cost data used in the transfer fee formula were taken from the PLP model.

The shipment volumes used in the transfer fee formula were not readily available when the transfer fee was instituted because DHL did not focus on how shipments were routed. To determine percentages of transfer shipments for 1987 and 1988, the number of transfer shipments was estimated by counting shipments originating in or destined for a Latin American country, Mexico, and/or Canada, with appropriate adjustments, and interviews with gateway managers. For 1989, the number of transfer shipments was estimated by taking a percentage (based on 1987 and 1988 data) of international inbound shipments. Annual transfer shipments for 1990 were estimated by sampling transfer shipments for 1 week, calculating a daily transfer shipment volume, and applying the percentage of daily transfer shipment volume to total annual Western Hemisphere shipments. The same procedure was used for 1991 as had been used in 1990, but using a 2-week sampling. A more refined transfer shipment cost calculation was devised for 1991.

The transfer fee was carried forward in the 1990 and 1992 agency agreements after the foreign investors became involved in DHLI.

IX.  Technology and Systems

Generally, DHL and DHLI each developed its own technology and systems.  Several software applications, however, developed by or for DHLI were adapted and used by DHL, and DHL sold DHLI rights to certain laser technology in 1984.  The sale price was $14.5 million, consisting of $10 million for the technology rights and $4.5 million for technical services.  The technology had been developed between 1982 and 1984 by NetExpress, Inc. (NetExpress), with funding from DHL.  DHLI did not use the laser system in its original form; instead, it was used after modifications.  The major reason for the sale of the laser technology was to raise capital for DHL during a period of acute financial problems.

In addition to the technology that DHL and DHLI each developed for its own use, certain shared technology was developed to enable DHL and DHLI to exchange information electronically.  Beginning in 1987, DHL and DHLI each paid for this shared technology service on a cost plus 10 percent basis. This shared technology was developed during the period 1982-92 by three companies:  NetExpress;  MRI, which managed the "Global MIS" group; and DHL Systems, Inc. (DHL Systems).

The Global MIS group of MRI was formed in 1986.  In 1987 and 1988, MRI/Global MIS was paid for management information services by DHL and DHLI in proportion to DHL's and DHLI's respective gross revenues, except for certain communications and other costs, which were paid on the basis of actual services.  The management information services and technology functions performed by MRI were taken over by DHL Systems in 1989.  During the years 1989-92, DHL Systems was paid for its services pursuant to an agreement between DHL and DHLI whereby DHL Systems was reimbursed for its costs in amounts proportionate to DHL's and DHLI's respective gross revenues, except where the anticipated benefits from particular projects could be allocated according to specific anticipated usages.  This method of cost allocation was not changed with the advent of the foreign investors in 1990 or 1992.  From 1986 through 1992, $178 million was expended for shared technology, consisting of approximately $40.5 million by DHL and $137.5 million by DHLI, or in a 22.8 percent to 77.2 percent ratio.

NetExpress was incorporated in 1982 as an 80-percent-owned subsidiary of DHL.  NetExpress had operated at a deficit, and in 1985 DHL sold to DHLI 200,000 shares of NetExpress stock for $20 per share, an arm's-length price.  DHL realized a $3.9 million taxable gain from the 1985 sale of NetExpress stock to DHLI.

In 1982, DHL provided the initial funding for the NetExpress tracing and tracking technology referred to as LaserNet.  The

amount of the funding was $290,000.  In 1983 and 1984, DHL made additional equity investments in and loans to NetExpress totaling $3,783,000.  In 1985 and 1986, DHL advanced loans to NetExpress in the amounts of $3,107,128 and $6,000,000, respectively.  In 1986, those loans were assigned from DHL to DHLI in exchange for an interest-bearing promissory note in the amount of $9,107,128.  The transfers of NetExpress stock and loans to DHLI benefited DHL by enabling it to raise cash.

When DHL Systems took over the technology functions of MRI in 1989, it was owned 50 percent by DHL and 50 percent by DHLI.  As part of this transition, MRI's technology assets were sold to DHL Systems.  The sale price was established by an independent third-party appraisal and was borne by DHL and DHLI in proportion to their ownership of DHL Systems; i.e., 50 percent by DHL and 50 percent by DHLI.

## X.  Respondent's Determination

Before issuance of the notices of deficiency to petitioners, no revenue agent's report was prepared and no international examiners' reports were issued to petitioners.  An economist's report was prepared in connection with the examination, but was not provided to petitioners until a Court order compelled its production in pretrial discovery.  The pre-notice audit process was protracted and did not operate on a free exchange of information basis.  Respondent issued third-party summonses seeking information about petitioners, and petitioners would not

agree to extend the assessment period, triggering the issuance of the notices of deficiency before respondent's receipt of complete information. The pretrial and trial dialogue in these cases was contentious. The parties' representatives gave no ground on any point and protracted the trial and pretrial activity.

The trademark sale adjustments and royalty deficiency notice determinations were developed by respondent's economist, Nicholas Baran (Baran). This was Baran's first IRS examination, and he had never previously valued a trademark. His prior experience with discounted cash-flow analysis related to bank loan portfolios.

Baran determined a worldwide value for the DHL trademark of $516,520,000 as of 1990 and $601,380,000 as of 1992. Baran valued the 1990 DHL trademark rights at $289,300,000 for domestic and $227,220,000 for foreign. Baran valued the 1992 DHL trademark rights at $350,870,000 for domestic and $250,510,000 for foreign. He valued the 1990 through 2004 DHL domestic trademark rights at $140,800,000, and valued those same rights beginning in the year 2005 at $148,500,000, as of 1990. Baran valued the 1992 through 2006 DHL domestic trademark rights at $170,370,000, and he valued those same rights beginning in the year 2007 at $180,500,000 as of 1992.

Baran considered a royalty rate in a license agreement between DHLI and a controlled subsidiary as a standard for use in valuing the DHL trademark. He used a 3-percent royalty rate for

his discounted cash-flow analyses and for his trademark royalty determinations. Baran relied upon a general industry survey of the licensing practices of unidentified companies. The trademark royalty adjustments proposed by respondent's trial experts were less than the adjustments for the corresponding years in the deficiency notices.

Walter Earl Huff (Huff) was used as an expert by respondent in connection with the determination of the imbalance fee, transfer fee, and network fee adjustments in the deficiency notices. Huff's expertise is in the petroleum industry. Respondent acknowledged that the 1991 and 1992 deficiency notice determinations relating to the imbalance and transfer fees are incorrect because part of the amounts allocated to petitioners had already been reported on the 1991 and 1992 returns.

Huff recommended a 15-percent cost plus markup method that was used in the deficiency notice adjustments. The notices of deficiency contained the same cost plus 15 percent markup method for the transfer fee adjustment as they did for the imbalance fee adjustment. Respondent's trial expert on the transfer and imbalance fees advocated a 4-percent cost plus markup.

In determining the imbalance and transfer fee adjustments, Huff applied the 1987 adjustment amount, $2,019,600, to the years 1975 through 1986 and a prorated amount for 1974, even though the shipment volumes were much higher in 1987. Huff did not subtract the trademark royalties, imbalance fees, and transfer fee

allocations from the network fee allocation, causing some duplicate income allocation.

In proposing the network fee adjustment, Huff based his conclusion on available information, and he did not think it necessary to analyze DHL's profitability on international outbound and domestic shipments.

OPINION

## I. Background

The nucleus about which the controverted issues revolve is a transaction among the shareholders of petitioners and related foreign DHL corporations and foreign investors. Those investors collectively became the majority shareholders in the related foreign DHL entities. That transaction involved the sale of more than 50 percent of the portion of the DHL network outside the United States. Respondent determined that section 482 should be employed to allocate income among petitioners and the related foreign corporations. Those allocations involve the sale and use of trademark and the exchange and performance of services with the potential for arm's-length pricing issues. In particular, respondent determined that, between controlled entities, the DHL trademark was sold for less than its fair market value, that DHL, as owner of the trademark, failed to charge royalties for DHLI's use of same, that the controlled corporations did not charge or charged less than an arm's-length amount for services between them, and that part of DHLI's income was allocable to DHL.

Under section 482, the Commissioner has broad authority to allocate income among commonly controlled corporations to prevent the artificial shifting of net incomes of controlled taxpayers and to place them on a parity with uncontrolled, unrelated taxpayers. Seagate Tech., Inc., & Consol. Subs. v. Commissioner, 102 T.C. 149, 163 (1994); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 352-353 (1991); see also Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 581 (1989), affd. 933 F.2d 1084 (2d Cir. 1991); Edwards v. Commissioner, 67 T.C. 224, 230 (1976); sec. 1.482-1(b)(1), Income Tax Regs.

The Commissioner's section 482 determination must be sustained absent a showing that he has abused his discretion. Paccar, Inc. v. Commissioner, 85 T.C. 754, 787 (1985), affd. 849 F.2d 393 (9th Cir. 1988). Consequently, the taxpayer bears the heavier than normal burden of proving that the Commissioner's section 482 allocations are arbitrary, capricious, or unreasonable. Your Host, Inc. v. Commissioner, 489 F.2d 957, 960 (2d Cir. 1973), affg. 58 T.C. 10, 23 (1972); Seagate Tech., Inc. & Consol. Subs. v. Commissioner, supra at 164; G.D. Searle & Co. v. Commissioner, 88 T.C. 252, 359 (1987). Whether the Commissioner's discretion has been abused is a question of fact. American Terrazzo Strip Co., Inc. v. Commissioner, 56 T.C. 961, 971 (1971). In reviewing the reasonableness of the Commissioner's allocation under section 482, we focus on the reasonableness of the result, not the details of the methodology

employed.  <u>Bausch & Lomb, Inc. v. Commissioner</u>, <u>supra</u> at 582; see also <u>Eli Lilly & Co. v. United States</u>, 178 Ct. Cl. 666, 372 F.2d 990, 997 (1967).

<u>II.  Were Respondent's Determinations in the Notices of Deficiency Arbitrary, Capricious, or Unreasonable?</u>

As explained above, taxpayers generally bear a heavier than normal burden of proving that the Commissioner's section 482 allocations are arbitrary, capricious, or unreasonable. Petitioners argue that their burden should be lessened once they can show that the notices of deficiency are arbitrary, capricious, or unreasonable.  Petitioners contend that the determinations in the notices are significantly different from the determinations advanced by respondent's experts at trial. Because of that and a procedural question, petitioners assert that their burden in these cases should be to show, by only a preponderance of the evidence, that the prices with any commonly controlled entities were consistent with an arm's-length price, citing <u>Seagate Tech., Inc. & Consol. Subs. v. Commissioner</u>, <u>supra</u> at 164.  Respondent contends that the actions taken and determinations made were reasonable under the circumstances.

Initially, petitioners point out that respondent did not issue or provide petitioners with any notice or report of the proposed adjustments before issuance of the notices of deficiency.  Petitioners then outline four instances where they contend that respondent's notice determinations were either

abandoned and/or ignored, and differing amounts and/or theories were advanced by respondent through expert witnesses.

Respondent does not deny that petitioners were not provided reports before the issuance of the notices of deficiency. Respondent generally explains that pre-notice reports were not compiled and/or provided because petitioners postponed meetings, delayed production, were uncooperative, and attempted to "mislead" respondent with respect to the relationship between DHL and DHLI.

In that regard, the Court has observed that, throughout the pretrial and trial portions of these cases, the parties were contentious and intractable. During the pretrial and trial portions of these cases, respondent's third-party summonses seeking information about petitioners remained in litigation in other courts. In the proceedings before this Court, the parties' representatives gave no ground on any point, causing, in some instances, the unnecessary protraction of the trial and parts of the pretrial portion of these cases. Petitioners did not agree to extend the period for assessment, triggering issuance of the notices of deficiency prior to respondent's receipt of complete information. The production of documents and responses to interrogatories by petitioners lingered beyond the commencement of the trial and necessitated certain procedural adjustments to accommodate generally dilatory compliance by petitioners and the untimely receipt of information by respondent. This pattern of

activity likely permeated the administrative portion of these cases, as respondent contends.

As a result, respondent's determinations were based on the information that had been made available. The issues in these cases are, in substantial part, factual and concern the value or price of an asset or service. A vastly disproportionate amount of the transcript and record consists of a "battle of experts". After the notice of deficiency was sent, respondent received substantial amounts of information that had not been available to respondent prior to the issuance of the deficiency notices. Respondent's experts used that information to reach their conclusions. The adjustments in respondent's notices exceeded the amounts respondent's experts opined for purposes of trial.

The examples cited by petitioners in support of their position include the trademark determination. During the administrative portion of this controversy, respondent's economist, Baran, estimated that the worldwide value of the DHL trademark was $516.5 million on the first of two valuation dates, and $601.4 million on the second. Respondent's experts, using differing assumptions and factual information, reached substantially reduced amounts. Baran also developed a trademark royalty based on a 3-percent rate relying on certain comparables. He concluded that for the 1974 through 1992 period the arm's-length royalty should have been $232,109,000, whereas respondent's trial experts, again using differing assumptions,

concluded that arm's-length royalties should be $83,129,000 for 1982 through 1992 or $57,095,000 for 1984 through 1992, respectively.

With respect to imbalance and transfer fees, duplications were contained in the notices of deficiency. The imbalance adjustments included the cost of deliveries that had already been reported on petitioners' returns. The determination, in addition to the cost amounts, added a 15-percent markup instead of the 2-percent markup reported. Respondent's trial expert, however, recommended a 4-percent markup, and respondent, for purposes of trial, conceded that the determination was overstated to the extent of the cost duplication portion of the above-described adjustment.

Finally, with respect to the network fee, the adjustment contained some duplication. Respondent's trial expert on this subject used a differing terminology to describe his proposed adjustment, and petitioners argue that either respondent has therefore abandoned the network fee adjustment set forth in the notices of deficiency or the network fee determination must be regarded as arbitrary, capricious, and unreasonable. Respondent counters that the network fee adjustment has not been abandoned and the approach taken in the notices and by the respondent's trial expert are reasonable.[3]

---

[3]  Due to our holding on the network fee issue, it is unnecessary to decide the parties' contentions.

Petitioners seek to lessen their burden with respect to each and every section 482 adjustment in controversy. Petitioners' burden is to show that each section 482 adjustment is arbitrary, capricious, and unreasonable. To do that, taxpayers normally show that the questioned transactions were conducted under an arm's-length standard. For purposes of seeking a lesser burden, petitioners do not address the ultimate question of what the proper arm's-length standard is. Instead, they argue that respondent's notices of deficiency are generally arbitrary because of failure to provide advance notification of the proposed determinations and because each of the section 482 determinations differs from the amounts, positions, and evidence offered by respondent at trial.

In Perkin-Elmer Corp. v. Commissioner, T.C. Memo. 1993-414, the Commissioner based the notice of deficiency section 482 determination on a particular theory and then abandoned that theory before trial. It was held that those circumstances were sufficient for the taxpayer to meet "its burden of showing respondent's allocations to be arbitrary, capricious, or unreasonable." Therefore the taxpayer in that case needed only to show that the questioned transactions were arm's length.

In National Semiconductor Corp. & Consol. Subs. v. Commissioner, T.C. Memo. 1994-195, the determinations in the notice of deficiency were based on a different methodology than the Commissioner's expert relied on at trial. In addition to the

differing methodology, the Commissioner's proposed reallocations, for purposes of trial, were substantially lower than the notice determination amounts.  Finally, at the trial in that case, the Commissioner did not support the notice determination and, instead, relied on the trial expert's analysis of the case.

In these cases, respondent's failure to prepare or provide pre-notice reports is not a violation of petitioners' rights. See Luhring v. Glotzbach, 304 F.2d 560 (4th Cir. 1962); Vallone v. Commissioner, 88 T.C. 794, 806-807 (1987); Estate of Barrett v. Commissioner, T.C. Memo. 1994-535, affd. 87 F.3d 1318 (9th Cir. 1996).  Nor is respondent's failure to provide pre-notice reports a procedural flaw that, per se, renders respondent's notice determinations arbitrary, capricious, or unreasonable. That is especially true here where petitioners' resistance and dilatory approach was, to some extent, the cause of respondent's agents' inability to provide pre-notice reports to petitioners.

For the most part, petitioners complain of the excessive nature of respondent's notice determinations or that respondent's trial experts' reports and testimony would support substantially smaller income tax deficiencies.  That, in itself, does not make respondent's determinations arbitrary.  Those matters are the essence of the controversy here.  Respondent's trial and briefing positions do not result in an increased adjustment from those in the notices of deficiency.  Nor has respondent advanced a new legal theory or issue for which respondent would bear the burden

of proof.   Unlike the circumstances in <u>Perkin-Elmer Corp. v.
Commissioner</u>, <u>supra</u>, respondent has not abandoned the notice
positions and advanced new ones.[4]  Petitioners have not shown
that any of respondent's section 482 determinations are
arbitrary, capricious, or unreasonable on the basis of the
information available to respondent at the time of the issuance
of the notices of deficiency.[5]  We hold that respondent's failure
to provide pre-notice reports, either alone or in conjunction
with the larger amounts determined in the notices as opposed to
the trial position amounts, does not provide a predicate for the
remedial action sought by petitioners.

In this setting, respondent's notice determinations were not
shown to be arbitrary, capricious, or unreasonable.  Although
respondent's trial position amounts are considerably less than
the amounts determined in the notices, with the exception of the
network fee adjustment, respondent's notice positions were not
abandoned or ignored.  To some extent, the reduced adjustments

---

[4]  Our reference to "positions" here does not include the
"network fee adjustment".

[5]  Petitioners ask us to judge respondent's actions in the
notices of deficiency.  Obviously, we cannot judge whether
respondent's determinations were arbitrary, capricious, or
unreasonable on the basis of the information available to
respondent after the trial record has been made, unless that
information was available to respondent when the determination
was made.  In the context of petitioners' preemptive approach, we
consider respondent's actions on the basis of the knowledge that
was made available by petitioners.  To do otherwise would
encourage taxpayers to keep from the Commissioner the information
they possess and then criticize the Commissioner's lack of
information to the taxpayers' advantage.

proposed by respondent at trial are attributable to information acquired by respondent after issuance of the notices of deficiency.  Ultimately, the factual information exchanged by the parties and then offered into evidence forms the basis for our opinion.  The amounts decided are considerably less than the amounts determined in the notices.  The decided amounts, however, fall somewhere in between the extreme trial positions of the parties.

The large difference between the amounts contained in respondent's notices and those proposed at trial and the differences between the parties' trial positions are largely attributable to the assumptions adopted by the parties' experts. For example, respondent's in-house expert used a 15-percent markup on the imbalance costs, whereas respondent's trial expert used a 4-percent markup.  Ironically, because petitioners' expert advocated a full cost approach to the imbalance adjustment, he was able to appear magnanimous by using the same 15-percent markup that had been used by respondent's in-house expert in the notice.  This serves to illustrate that differences in assumptions made large differences in the determinations and the parties' positions.  The assumptions relied on by respondent were not arbitrary, capricious, or unreasonable considering the circumstances here.

Accordingly, respondent's notice determinations, although resulting in determinations at the outside margins, represent a

reasonable protective approach based on the information that was made available and the conditions extant at the time of the determination.  Therefore, petitioners have not shown that they should be relieved from showing an abuse of discretion by respondent.[6]

III.  The Question of Control

Respondent's authority to allocate income is predicated on the entities' being commonly controlled.  For purposes of section 482, "control" is broadly defined to include "any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised."  Sec. 1.482-1A(a)(3), Income Tax Regs.  In determining whether entities are commonly controlled, the courts look to "reality of control" rather than just to actual stock ownership.  Grenada Indus., Inc. v. Commissioner, 17 T.C. 231 (1951), affd. 202 F.2d 873 (5th Cir. 1953).  Further, when the interests controlling one entity and those controlling another have a common interest in shifting income from the former to the latter, entities may be considered commonly controlled.  This is especially true where one entity deals with another on other than an arm's-length basis.  Sec. 1.482-1A(a)(3), Income Tax Regs.

---

[6]  Ultimately, our ruling on this aspect has no effect on the outcome of the issues.  In one instance, petitioners showed an abuse of discretion; in all others the outcome was based on a preponderance of the evidence to decide fair market value or arm's-length prices.  The ultimate findings or holding generally fell somewhere in between the parties' trial positions.

Because petitioners argue that DHL and DHLI were operated in a separate manner, and because of the two-step progression of the transaction with the foreign investors, the question of control must be addressed at three different points. First, there is the period prior to 1990 when there was some common stock ownership between DHL and DHLI. Then we must consider the interim period 1990 to 1992 when the foreign investors collectively had less than a majority of the stock holdings and had a majority of the DHLI board seats. And finally, there is the period after the foreign investors exercised their "option" collectively to acquire a shareholding majority.

Until the time of trial, petitioners denied the existence of any common control within the meaning of section 482. At trial, petitioners conceded that the requisite control existed before 1990, so that the remaining controversy as to control concerns the 1990 to 1992 period and the period after the foreign investors gained collective shareholding control of the foreign portion of the DHL network.

A. Was There Common Control After December 7, 1990?

Petitioners contend that the foreign investors gained control of DHLI/MNV as of December 7, 1990, when they became able to exercise their contractual right to appoint 7 of the 13 board members of DHLI's and MNV's boards. Petitioners acknowledge that the DHL shareholders retained legal title to a majority of the outstanding shares, but they argue that actual control should be

distinguished from legal ownership. Even if the DHL shareholders are found to have controlled the entities within the meaning of section 482, petitioners argue that the transfers of the DHL trademark did not occur until September 17, 1992, about 1 month after the August 18, 1992, exercise by the foreign shareholders of the option enabling them to collectively hold 57.5 percent of the shares in the new corporate entity that replaced DHLI/MNV.

Conversely, respondent argues that the DHL shareholders maintained the requisite control after December 7, 1990, because the foreign investors collectively held only 12.5 percent of the outstanding stock until their exercise of the 1992 option. Respondent attempts to minimize the foreign investors' board control by contending that they did not have an agreement among them to vote their shares to elect directors. In addition, respondent contends that certain limitations placed on the board's powers lessen the effect of the foreign investors' making up the majority of that body. Finally, respondent argues, in the alternative, that section 482 would permit reallocation because the common control factor should be measured at the time the parties arrange and agree to the transaction in question and not necessarily at the time the transfer(s) or services occur.

We agree with respondent that the requisite control existed after the first stage of the transaction (December 7, 1990), even though the foreign investors collectively had been given the ability to control the boards. One of the underlying purposes of

the two-stage transaction was the comfort of the foreign investors.  They had conducted a thorough due diligence and uncovered a number of concerns.  The creation of a two-stage transaction permitted them to become involved in the entities in order to decide whether they wished ultimately to acquire a larger financial commitment and shareholding, along with the acquisition of the DHL trademark.

Initially, the foreign investors collectively purchased a 12.5-percent interest in DHLI/MNV, but they would not have been able to recoup their investment if they had not opted collectively to acquire an additional 45 percent of the entities and/or the DHL trademark.  Their ability to control the boards gave them a form of assurance or security to protect their initial investment and to permit closer scrutiny and involvement if they so desired.  The boards, however, did not control the day-to-day operations of DHLI/MNV, and the foreign investors' employee presence in the operating entities was de minimis during the interim period (late 1990 to late summer 1992).

The structure of the transaction through the interim period also included several assurances and protections for the DHL shareholders.  For example, the DHL shareholders had to approve: Any board action that changed the employment status of Lupo and certain other employees; the issuance of DHL shares or other related securities; certain actions concerning debt or leases; and changes in DHL's auditors or accounting policy.  In addition,

certain key board decisions required supermajority approval, including:  Amendments to the bylaws and articles of association; entering into a new business other than one that was directly related to the principal business of DHL; reappointment of the CEO; certain debt or lease financing decisions; and matters that exceeded a fair market value of $20 million, excluding the exercise of the trademark option.  For these matters, the foreign investors' majority was not sufficient for control.

Accordingly, the foreign investors did not have shareholding control, and, as to many critical matters, their collective board control was limited.  We must also weigh the fact that the foreign investors did not have an agreement to collectively control the board or to take any particular actions together.

Considering the above, we hold that requisite control existed for application of section 482 during the interim (1990 to 1992) period that concluded when the foreign investors exercised their options and acquired additional shares.

B.  Effect of the Trademark Transfer After the Foreign Investors Attained Their Collective Shareholding Majority of the New DHLI/MNV Entity

Petitioners argue that, even if the Court should find that the requisite control existed during the interim period, the trademark rights should not be subject to a section 482 allocation because the trademark rights were transferred about 1 month after the exercise of the foreign investors' 45-percent share option.  Petitioners contend that respondent may not

reorder the steps of the trademark transfer portion of the transaction and conclude that it occurred before the foreign investors actually gained control of DHLI/MNV or its successor.

Respondent counters that the requisite control should be measured or considered when the controlling persons or entities are dealing with each other. Under respondent's approach, all that is necessary is that the control exist when the parties irrevocably bind themselves to a transaction. Under this approach, accordingly, even though the parties' execution of the agreement terms may occur when control no longer exists, respondent would have section 482 authority to reallocate. Respondent relies on Rooney v. United States, 305 F.2d 681, 683 (9th Cir. 1962), a case in which expenses incurred by a liquidated corporation were allocated to a successor corporation that had profited from transferred assets on which the expenses were incurred.

We agree with respondent and hold that it is appropriate to use a transactional approach to a specific transaction that was formulated at a time of requisite control and executed after the requisite control no longer existed. That is especially so here, where the options for the foreign shareholders to gain control and the transfer of the trademark rights to the new foreign shareholder corporation were part of the same transactions, the terms of which were preconceived, concurrent, and interdependent and occurred within 1 month of each other. A transactional

approach is appropriate where the substance of the entire transaction so requires.[7] See <u>Arrowsmith v. Commissioner</u>, 344 U.S. 6 (1952), and the discussion in <u>Cayuga Service, Inc. v. Commissioner</u>, T.C. Memo. 1975-4. To permit petitioners to avoid appropriate section 482 reallocation merely because they changed the order of the events in a single series of transactions would unnecessarily exalt form over substance.

## IV. Ownership and Value of the DHL Trademark

### A. Ownership

Respondent determined that DHL sold the DHL trademark to DHLI for less than its fair market value. Petitioners argue that DHL did not own the worldwide rights to the trademark, but that it did own the rights in the United States. Because of the obvious effect the ownership question may have on the question of value, we address the ownership question first.

Ownership and value of the DHL trademark has been one of the bones of contention between the parties. Respondent's determination placed the value of the worldwide rights in the $500/$600 million range for the 1990-92 transaction. A $20

---

[7] A transactional approach, however, may not be appropriate where goods or services are independently contracted for after the requisite control no longer exists. That should be the case even if the form or substance of the transaction was dictated or patterned after the approach used when requisite control existed. In the context of these cases, it would not be appropriate to approve reallocation of the cost of arm's-length services performed after the 1992 transaction concluded, unless the requisite sec. 482 control existed after 1992. Because of our holdings on the post-1992 issue, we need not address the control question for that period.

million price was ultimately used by the parties to the transaction after $50 million had been considered and $100 million asked. Petitioners' and respondent's pre- and post-trial experts attempted to support all of these values and a myriad of amounts falling in between.[8]

One of the underlying disputes regarding the value of the DHL trademark rights involves whether DHL owned the worldwide or merely the U.S. rights. Most of the documents and evidence show or state that DHL owned all of the rights. DHLI's general counsel, beginning in the mid to late 1980's, however, maintained that DHLI owned the rights to the trademark outside the United States. The parties here provided expertise supporting both positions, and we have considered each.

A trademark is a marketplace device by which consumers identify goods and services and their source. In the context of trademark nomenclature, a trademark symbolizes "goodwill" or the likelihood that consumers will make future purchases of the same goods and services. In a licensing arrangement, the goodwill symbolized by the trademark is owned by the licensor, even though created by the licensee's efforts. See, e.g., Cotton Ginny, Ltd. v. Cotton Gin, Inc., 691 F. Supp. 1347 (S.D. Fla. 1988).

---

[8] To some extent, it seems that the experts' willingness to support such disparate values is one of the reasons for the escalation and protraction of the controversy in these cases. Indeed, the difference between $20 million and $600 million may be sufficient spoils to incite and inspire the meekest and least confrontational amongst us.

> Trademark recognition develops from years of advertising, consistent packaging, promotional campaigns, customer service, and quality control.  Depending on the strength of a trademark, the maintenance of the desired consumer awareness level generally requires significant, continuing advertising investment and product renovation.  Trademarks lose substantial value without adequate investment, management, marketing, advertising, and sales organization.

Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441, revd. and remanded on other grounds 152 F.3d 83 (2d Cir. 1998).

The validity of a trademark license is dependent upon the licensor's control over the nature and quality of goods and services sold under the trademark by the licensee.[9]  The quality control requirement has been codified in the Lanham Act, 15 U.S.C. secs. 1055, 1127 (1994), and is judicially recognized.  See Haymaker Sports, Inc. v. Turian, 581 F.2d 257, 261 (C.C.P.A. 1978); Dawn Donut Co. v. Hart's Food Stores, Inc., 267 F.2d 358, 366-367 (2d Cir. 1959).  A purported trademark license without quality control can result in abandonment of the licensor's rights in the mark, a condition that has been also denominated "a naked license".  Stanfield v. Osborne Indus., Inc., 52 F.3d 867, 871 (10th Cir. 1995); see also 2 McCarthy, McCarthy on Trademarks and Unfair Competition, sec. 18.48, at 18-75 to 18-76 (4th ed. 1997).  The parties' experts all agree that quality control is essential to a valid license.

---

[9]  See 2 McCarthy, McCarthy on Trademarks and Unfair Competition, sec. 18:42, at 18-66 (4th ed. 1997).

Trademarks are territorial, and different ownership of the same trademark is possible in different countries.[10] In the United States, trademarks may be created by use and protected by registration. Outside the United States, trademark rights may be created by use and/or registration, and, in some instances, registration is prima facie evidence of ownership.

First, we briefly review the factual background for the development and use of the trademark within the DHL worldwide network. The DHL worldwide network began with a single company and, because of a competitor's complaints to the CAB, was divided into essentially two operating entities--domestic (within the United States) and international (outside the United States). Although the shareholdings of the domestic and international business entities appeared disparate, in actuality the entire network was controlled by a group of shareholders, who ultimately split up profits from the sale of a part of the network in accord with their preconceived understanding that did not necessarily comport with the ostensible shareholdings.

The domestic and international operating entities were relatively autonomous in their day-to-day operations but were overseen and controlled by various groups and/or entities controlled by the common controlling shareholders. All of the agreements, written or understood, reflect that DHL owned the DHL name (trademark) and that DHLI was allowed to use it because of

---

[10] 4 McCarthy, _supra_ sec. 29:7

DHL's consent.  DHLI, however, caused registrations of the DHL trademark in numerous countries in which the DHL network provided services.  Those registrations were in the name of DHLI and/or its related international entities and did not reflect that DHL owned or licensed the trademark.  In addition, DHLI's general counsel contended, in spite of written agreements to the contrary, that DHLI owned the trademark rights outside the United States because of DHLI's foreign registration of the trademark.

With this somewhat generalized background, we consider the positions of the parties and their experts on the question of ownership of the DHL trademark.  Petitioners contend that DHL owned the rights inside and DHLI owned them outside the United States.  Respondent contends that DHL owned the worldwide rights before the transaction with the foreign investors.

Respondent makes a three-point argument in support of the position that DHL owned the worldwide rights in the trademark. First, respondent argues that, as a matter of trademark law, DHLI was contractually cast as a licensee and that the requisite control existed as between the licensor and licensee to maintain and perfect DHL's trademark ownership.  Second, respondent argues that petitioners may not disavow the form they chose and that the 1974 MOA, subsequent amendments, and other documentation placed ownership in DHL.  Finally, if we find that the requisites for trademark ownership were not extant, respondent argues that the

contracts entered into by DHL and DHLI were still enforceable, as between them.

Petitioners take a different tack from respondent's approach by arguing that the arrangement between DHL and DHLI would not meet the applicable section 482 regulations so as to require reallocation as to that intangible asset. Petitioners also argue that, as a matter of law, trademark rights exist separately in each country of registration and DHLI acquired the rights by registration and use. If we decide that DHL owned the worldwide rights to the trademark, petitioners argue that they should be allowed a setoff equal to the value of assistance or cost borne by DHLI in developing the trademark rights outside the United States. The parties provided four well-qualified experts on trademark law.

Respondent's expert on trademark ownership is a practicing lawyer with 30 years' experience, including litigation, in intellectual property law, specializing in trademarks and unfair competition. He concluded that, with the possible exception of certain Central American countries, the agreements between DHL and DHLI established DHL as the owner of the trademark rights. His interpretation of the 1974 MOA and related agreements is that they give DHL the ownership in the trade name and trademark, in particular because DHLI could not assign the foreign registrations without DHL's consent and because of DHLI's obligation to cease use everywhere for 5 years upon termination

of the DHL/DHLI relationship. He also opined that DHLI was a licensee of the trademark, and nothing in the trademark law served to change that relationship between DHL and DHLI.

Respondent's expert's conclusions are based, in part, on DHL and DHLI's agreement that New York law would govern the trademark issue beginning in 1990 and that the 1974 MOA contained an arbitration clause under the laws existing in the U.S. District Court in the Territory of Guam.

Petitioners offered three experts on the question of trademark ownership, two professors, each with 30 years' experience in this field, and a British solicitor who specializes in trademarks in the United Kingdom and other countries. Both professors, when measuring the written agreements between DHL and DHLI against the exacting standards of trademark law, concluded that DHL owned the trademark rights within the United States and DHLI owned the rights outside the United States. The solicitor concluded, by means of a six-issue analysis, that the trademark was not "an indivisible global asset owned by DHL" and that a decision of a court of the United States would not affect DHLI's rights in the existing registrations in foreign countries.

The reports and testimony of the experts provided the Court with helpful guidance in this technical and specialized area of the law. To some extent, we agree with each of the parties' experts. Petitioners' experts defined the strict letter of the law to perfect and maintain trademarks in the United States and

abroad. Respondent's expert, as a trial lawyer, advanced a more practical formulation, reflecting what would have resulted if the parties' agreements and actions were contested and subjected to litigation.

The informality and lack of precise language used by DHL and DHLI would have caused more problems in transactions between unrelated third parties seeking to enforce their rights to the DHL trademark. But here we have corporate entities with interlocking shareholder control and a common purpose of establishing and maintaining a worldwide delivery network under the name "DHL". DHL's and DHLI's respective rights and obligations concerning the trademark are sufficiently defined to be enforceable. Both parties agree that DHL's ownership of the trademark in the United States is without question.

DHL's lack of involvement in the foreign registrations and the lack of precise and more formal agreements and standards, however, lessens the quality of DHL's ownership rights and interests in the registration and rights to the DHL trademark outside the United States. Because DHL had the ability to terminate and/or cause DHLI's inability to use the trademark for a 5-year period, the import of DHLI's foreign registrations is mitigated. Finally, in the factual context of these cases, common shareholders controlled DHL and DHLI, and the foreign investors had the option to acquire a collective majority interest in DHLI/MNV and the DHL trademark worldwide. Although

that fact should not have an effect on the stand-alone value of the trademark, in the enforcement of ownership context, it has the effect of neutralizing the foreign registrations in DHLI's name. These weaknesses in the quality of DHL's ownership of the DHL trademark do not have the effect of making DHLI the uncontested owner of the trademark rights outside the United States, but would have a profound effect on a buyer's willingness to pay top dollar and the value of the DHL trademark worldwide.

We hold that DHL owned and controlled the worldwide rights to the DHL trademark, but that, as discussed above, the rights outside the United States were subject to weaknesses and questions that would affect the quality and value of DHL's interest. Our conclusion and holding is also based on the following analysis.

After dividing the DHL network into domestic and foreign operating entities, DHL and DHLI entered into the 1974 MOA which, in part, concerned the DHL trademark. The parties used the term "license" to describe DHL's agreement to allow DHLI to use the name "DHL". Throughout subsequent amendments of the 1974 MOA, that terminology was not contradicted or expressly modified. For most of the period under consideration, DHL had the ability to terminate the arrangement, which would have contractually prohibited DHLI from using the trademark for a period of 5 years. In negotiating with investors interested in part or all of the DHL network, DHL was represented as the owner of the DHL

trademark worldwide. Although there was some doubt about the quality of DHL's ownership of the international rights to the trademark, the parties to the transaction in question treated DHL as the worldwide owner. Only DHLI's general counsel held the view and expressed doubt about DHL's ownership of the rights to the trademark outside the United States. There can be no doubt here, however, that the shareholders and principals of DHL and DHLI/MNV intended that DHL own the trademark and that DHLI's interest was that of a licensee.

Petitioners attack the license terminology that they used to cast the relationship between DHL and DHLI as to the trademark and its use by arguing that the mere expression of the term "license" does not establish and/or maintain a license relationship. They argue that, without quality control exercised by the trademark owner (licensor) over the licensee, the requisite control of the trademark use and services performed by the licensee would not exist.

However, respondent has shown by ample evidence in the record that, as between DHL and DHLI, the requisite control did exist. The existence of that control is found in the unique relationship of the corporate entities, their shareholders, and the manner in which the business entities were operated, coordinated, and presented to the public as a worldwide delivery network with the name "DHL". Although the 1974 MOA and other documents that defined the ownership, rights, and use of the

trademark fall short of the strictest quality control standards requisite for a textbook-quality license agreement that may be required as between unrelated third parties, they are sufficient and enforceable in the circumstances here.

Petitioners make a collateral attack on the ownership issue. They seek refuge in section 482 regulations in an attempt to show that the form they chose should not be respected. Petitioners' argument focuses on the 1968 regulations[11] and points out that they do not contain mention of a license as a factor relevant to which person or entity should be considered to have "developer" status of intangible property. See sec. 1.482-2(d)(1)(ii), Income Tax Regs. In essence, petitioners argue that legal ownership should be disregarded for purposes of any section 482 reallocation of intangibles.

Respondent argues that the facts here support a finding that DHL is the developer or that the regulations in question provide that, in the absence of a bona fide cost-sharing arrangement, respondent may make allocations upon the transfer of intangible property by the developer to a related entity. Respondent

_____

[11] The parties refer to the regulations that were promulgated in 1968 because the newer sec. 482 intangible property regulations were adopted in 1994, and petitioners did not elect, pursuant to sec. 1.482-1(j), Income Tax Regs. (1994), to have them apply retroactively.

Sec. 1.482-2(d), Income Tax Regs., was effectively superseded by sec. 1.482-4T, Temporary Income Tax Regs., 58 Fed. Reg. 5263, 5287 (Jan. 21, 1993), generally effective for taxable years beginning after Apr. 21, 1993. The tax years in issue are 1990, 1991, and 1992.

further contends that there was no cost-sharing arrangement between DHL and DHLI.  Finally, respondent contends that petitioners failed to show that DHLI either developed or assisted in developing the intangible (trademark) because it has not been shown that the advertising expenditures incurred by DHLI were more than what would have been incurred at arm's length; i.e., allocation from DHL to DHLI is not appropriate.

Petitioners counter that respondent may not choose either to "invoke" the section 482 regulations and make an allocation based on the developer/assister standard, or to ignore those regulations and make an allocation "pursuant to" the parties' licensor/licensee relationship.  Petitioners rely on the language of section 1.482-2(d)(1)(ii)(a), Income Tax Regs., that "no allocation * * * shall be made" with respect to a transfer of intangible property unless either (1) there is a "bona fide cost sharing arrangement" as defined in section 1.482-2(d)(4), Income Tax Regs., or (2) the intangible has been transferred by the "developer" within the meaning of section 1.482-2(d)(1)(ii)(c), Income Tax Regs.  Petitioners contend that respondent has denied the existence of a bona fide cost-sharing arrangement in these cases and that, therefore, any section 482 allocation must be based on the developer/assister standard.  Finally, petitioners contend that respondent, under the regulations, may make an allocation (reduction of value) for an "assistance" provided by DHLI if DHLI is not considered the "developer" of the intangible.

The referenced regulations are clearly not intended for the purpose of deciding the ownership of an intangible. Instead, they are designed to assist in allocation. In that regard, petitioners argue that the referenced regulations ignore ownership in the process of allocating an arm's-length price. In answering the question of whether the ownership of the DHL trademark was bifurcated between DHL and DHLI, we do not look to the section 482 regulations cited by petitioners. Although those regulations may have some effect on our allocation decision, they are not relevant in deciding the ownership of the trademark rights as a predicate for valuing the trademark.

Petitioners contend that they sold only the U.S. trademark rights. Because we have decided the ownership question, we will consider whether and to what extent the section 482 regulations may have an effect on allocation of the value.

### B. Value of the DHL Trademark

As previously noted, the value of the worldwide right to the DHL trademark as determined by respondent in the deficiency notices is almost $600 million greater than the value advocated by petitioners. In that regard, we note that such extreme differences "demonstrate the caution that is necessary in weighing expert valuations that zealously attempt 'to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise' (Messing v. Commissioner, 48

T.C. 502, 512 (1967))".  Estate of Hall v. Commissioner, 92 T.C. 312, 338 (1989).

On brief, petitioners argue that the $20 million price agreed to by the parties to the transaction was at arm's length because of the differing and adverse interests as between the controlling shareholders and the foreign investors.  Petitioners also contend that the 1989 negotiations established "a $50 million ceiling value" for the DHL trademark worldwide.  The main thrust of petitioners' argument on value is that tangible and intangible components (other than the trademark) of the DHL air express network and the ability to efficiently deliver are worth more to customers than the DHL name, and, therefore, the network was "far more valuable" than the trademark.

Respondent, on the other hand, contends that an analysis of the values used by the parties to the transaction will reflect that the intangibles, primarily the trademark, were valued by the foreign investors at almost $300 million[12] and that amount comports with respondent's experts' proffered values.  As an alternative, respondent argues that value resides in DHL's retention of the right to use the DHL trademark in the United

---

[12] Respondent's determination alternatively valued the trademark in 1990 and 1992.  The 1992 valuation produced the higher amount approximating $600 million and the 1990 valuation was closer to $500 million.  Respondent's litigating position, which is based on the 1990 date, approximates a $300 million value for the trademark.

States for a period of years as additional noncash consideration, citing <u>Alstores Realty Corp. v. Commissioner</u>, 46 T.C. 363 (1966).

Respondent's notice determination was based on alternative valuation dates in 1990 and 1992. The use of two possible dates is likely due to confusion over when the DHL trademark should be valued. The confusion probably arose because the transaction and prices to be paid were agreed to during 1990 and the actual sale or exchange occurred in 1992. We have no question about the fact that the taxable event occurred in 1992, and any additional capital gain from petitioner's sale of its interest in the DHL trademark would be includable in the 1992 taxable year.[13] On brief, respondent advances only the 1990 valuations of his experts, and petitioners do not argue that 1992 would be the more appropriate year for valuation. Petitioners, on brief, argue that any capital gains adjustment attributable to the sale of the trademark should be recognized in 1992. It therefore appears undisputed that any such adjustment should be recognized in 1992, but valued as of the time the right to acquire was created (1990) for purposes of section 482.[14]

---

[13] On brief, both parties advocated 1992 as the year of any recognition of income from the trademark sale.

[14] Petitioners also argued that the sale of the trademark occurred after the foreign investors gained collective control of the international entity so that sec. 482 should not apply for lack of the requisite control. We have already addressed that question and resolved it adversely to petitioners.

Trademarks, trade names, brand names, and other similar items are treated as intangible property and are covered by section 1.482-2(d),Income Tax Regs. (1968), which deals with the transfer or use of intangible property.  Section 1.482-2(d)(2)(ii), Income Tax Regs., provides the general rule that, in determining "the amount of an arm's length consideration, the standard to be applied is the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances."  The regulation goes on to enumerate the following factors that may be considered in arriving at the amount of the arm's-length consideration:

(a) The prevailing rates in the same industry or for similar property,

(b) The offers of competing transferors or the bids of competing transferees,

(c) The terms of the transfer, including limitations on the geographic area covered and the exclusive or nonexclusive character of any rights granted,

(d) The uniqueness of the property and the period for which it is likely to remain unique,

(e) The degree and duration of protection afforded to the property under the laws of the relevant countries,

(f) Value of services rendered by the transferor to the transferee in connection with the transfer within the meaning of paragraph (b)(8) of this section,

(g) Prospective profits to be realized or costs to be saved by the transferee through its use or subsequent transfer of the property,

(h) The capital investment and starting up expenses required of the transferee,

\*       \*       \*       \*       \*       \*       \*

(j) The availability of substitutes for the property transferred,

(k) The arm's length rates and prices paid by unrelated parties where the property is resold or sublicensed to such parties,

(l) The costs incurred by the transferor in developing the property, and

(m) Any other fact or circumstance which unrelated parties would have been likely to consider in determining the amount of an arm's length consideration for the property.

Sec. 1.482-2(d)(2)(iii), Income Tax Regs.

"'[F]air market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts.'" United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting section 20.2031-1(b), Estate Tax Regs.). In addition to proving that the deficiencies set forth in the notices of deficiency are arbitrary, capricious, or unreasonable, the taxpayer has the burden of proving satisfaction of the arm's-length standard. See Sundstrand Corp. v. Commissioner, 96 T.C. at 354.

Two expert witnesses with backgrounds in business, finance, or economics testified in support of respondent's trademark valuation position. Both experts used an income methodology to value the trademark or the rights to use (royalties). One used the relief-from-royalty approach and the other used the relief-from-royalty approach coupled with another income methodology to

arrive at opinions of value. One of respondent's expert's reports reflects worldwide values for the DHL trademark of $287 million and $409 million as of the 1990 and 1992 valuation dates, respectively.[15] He also opined that DHL's right to use the trademark for 15 years beginning 1992 had a 1992 value of $58 million and that DHLI's use of the trademark for 1982 through 1992 had a value of $83,129,000.

Respondent's other expert opined that the DHL trademark had worldwide values of $327.5 million and $489.6 million as of the 1990 and 1992 valuation dates, respectively.[16] He also opined that DHLI's use of the DHL trademark for 1984 through 1992 had a value of $57.095 million, and DHL's 15-year use of the trademark, beginning in 1992, had a $46.4 million value as of 1992. He calculated DHLI's revenues attributable to DHLI's use of the DHL trademark, as follows:

---

[15] This expert offered by respondent ascribed separate trademark values to the U.S. and non-U.S. rights as follows:

|  | 1990 | 1992 |
|---|---|---|
| U.S. | $93 million | $102 million |
| Non-U.S. | 194 million | 307 million |
| Worldwide | 287 million | 409 million |

[16] Respondent's other expert assigned separate trademark values to the U.S. and non-U.S. rights as follows:

|  | 1990 | 1992 |
|---|---|---|
| U.S. | $89.3 million | $122.2 million |
| Non-U.S. | 238.2 million | 367.4 million |
| Worldwide | 327.5 million | 489.6 million |

| | |
|------|-----------------|
| 1984 | $367,841,000 |
| 1985 | 431,929,000 |
| 1986 | 534,283,000 |
| 1987 | 687,427,000 |
| 1988 | 832,879,000 |
| 1989 | 974,050,000 |
| 1990 | 1,146,312,000 |
| 1991 | 1,404.800,000 |
| 1992 | 1,725,850,000 |

The expert's computations imply that the income earned is from the trademark and not from other intangibles or assets. We do not agree that these income figures show only the value of the trademark, but they do reflect that DHLI's revenues were generally increasing and substantial. There is no question that the DHL name had some role in DHL's, DHLI's, and the DHL network's success.

Petitioners proffered one valuation expert, an economist, who used the relief-from-royalty income approach to value the trademark and two additional economists who opined on whether valuable intangibles existed in the context of the DHL network. One of petitioners' experts concluded that DHLI had valuable intangible assets including a cost advantage from its volume and its reputation for reliable performance and that it was those attributes and not the DHL name that had value to DHLI. Another of petitioners' experts, using a different methodology, similarly opined that it was the DHLI infrastructure that made the difference and that DHL did not possess an intangible (including the trademark) that caused DHLI's success. Finally, petitioners' valuation expert opined that the DHL trademark had $55.2 million

and $70.2 million worldwide values on the 1990 and 1992 valuation dates, respectively.[17]

Respondent attempts to corroborate the experts' 1990 valuations of $287 million and $327.5 million by contending that the 1990-92 transactional figures would support a $300 million value for the intangibles (in respondent's view attributable to the trademark). Respondent points out that DHLI/MNV's combined shareholder equity at the end of 1998 netted out at $202 million (positive $226 for DHLI and negative $24 for MNV). Considering that the foreign investors paid $287.5 million for a 57.5-percent shareholding interest of DHLI/MNV ($500 million times 57.5 percent), it follows that they were also "acquiring" 57.5 percent of the net shareholder equity or $116.15 million ($202 million times 57.5 percent). Therefore, respondent contends, the foreign investors paid $171.35 million ($287.5 million less $116.15 million) for the "off-balance sheet assets". Finally, if the 57.5 percent of the intangibles equaled $171.35 million, then 100 percent equaled approximately $300 million ($171.35 divided by 57.5 percent equals $298 million).

---

[17] Petitioners' valuation expert estimated separate trademark values of the U.S. and non-U.S. rights as follows:

|  | 1990 | 1992 |
|---|---|---|
| U.S. | $24.2 million | $18.2 million |
| Non-U.S. | 31.0 million | 52.0 million |
| Worldwide | 55.2 million | 70.2 million |

Respondent also argues that the $500 million value of DHLI/MNV implied by the foreign investors' 57.5 percent/$287.5 million price is short of the actual value because it does not include a control premium. Respondent points out that although the three foreign investors acquired a 57.5-percent interest in concert, none of them held a majority interest, and the DHL shareholders, either individually or collectively, did not hold a majority interest. Accordingly, if control had been purchased the price would have been higher, thereby supporting an amount in excess of $300 million for the intangibles.

Petitioners argue, and we agree, that respondent's control premium position has no place in determining the value of the assets individually. More particularly, a control premium has been held to reflect the value of the shareholder's right to determine corporate policy, "over and above the value that is attributable to the corporation's underlying assets using traditional valuation methodologies." Philip Morris Inc. v. Commissioner, 96 T.C. 606, 628 (1991).

As to respondent's position that the transactional figures could support a $300 million value for the intangibles, petitioners' rebuttal is that the transaction was arms length. In other words, petitioners contend that the foreign investors, on the basis of advice and information from their advisers, independently came up with a $450 million price for the stock and a $50 million price for the trademark. Respondent disagrees and

contends that neither the $50 million nor the $20 million was arrived at either at arm's length or on a fair market value basis.

Respondent, in support of that position, makes the following points: (1) When the $20 million price was negotiated and established during 1989 and 1990, DHL and DHLI were owned and controlled by the same interests within the meaning of section 482. (2) The first price set, $50 million, did not represent an objective or fair market valuation of the trademark but instead represented the amount of capital the foreign investors wished to inject into DHL because of its fragile financial condition. (3) The foreign investors and DHL shareholders each had tax considerations, which to some extent were motivating factors for numerous proposals during the negotiations, the setting of prices, and the proposed movement of assets in the transaction. (4) Petitioners' lawyers orchestrated the price reduction from $50 million to $20 million for the trademark, by recommending the removal of favorable provisions, including DHL's ability to terminate on 90 days' notice and by encumbering the trademark with "two reverse royalty-free 15-year licenses running to the seller and buyer". (5) The foreign investors went along with these approaches so long as their concerns were addressed; i.e., among others, that $50 million of capital be infused into DHL.

We are convinced that there was a certain acquiescence on both sides of this transaction that was motivated by the desire

to close the deal and save taxes.  We are cognizant that the foreign investors did not buy an entire business entity. Instead, the foreign investors, in accord with their goal of gaining access to the international portion of the DHL network, entered into a symbiotic relationship with the DHL shareholders and, in essence, became the collective majority "partners" in the international portion of the network.  To insure that any problems with DHL (financial or otherwise) did not deprive them of their acquired access to the international portion of the DHL network, the foreign investors sought to remove the DHL trademark from DHL and to include it in the entities in which they collectively had a 57.5-percent shareholding.

In that same setting, the DHL shareholders collectively had a 42.5-percent interest in the international portion of the network and, ultimately, the DHL trademark.  In essence, the DHL shareholders sold only a portion of the international business. The transaction here was not in the normal mold of the willing buyer who purchases a single asset or business to do with as he wishes.  Here, the parties were attempting to build an operating consensus, and each attempted to build in the safeguards and elements that would achieve its goals and protect its acquired or remaining combined investments or interests.  The existing shareholders and foreign investors were attempting to formulate and participate in a corporate pool of rights and assets.  As such, the foreign investors purchased collectively fractional

ownership in DHLI. In that regard, they only acquired, in theory, a fractional interest in the trademark. These circumstances permitted a certain amount of flexibility and subjectivity in setting prices and arranging terms.

Accordingly, we agree with respondent that neither the $50 million nor $20 million price for the DHL trademark was set at arm's length or represented a fair market value, as those terms have been defined. Fair market value is based on a willing buyer and seller. United States v. Cartwright, 411 U.S. at 551. More importantly, the willing buyer is a purely hypothetical person or entity, and the personal characteristics of the parties to the transaction are not taken into account in the valuation. Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); see also Estate of Mueller v. Commissioner, T.C. Memo. 1992-284.

We now proceed, based on the record, to decide the fair market value of the DHL trademark worldwide. After deciding the value, we shall decide whether any adjustments to the value are appropriate. We agree with respondent's litmus test approach reflecting that the grossed-up price paid by the foreign investors reflects value in excess of the shareholder equity shown in the books of DHLI and MNV. Petitioners' experts also agreed that value in excess of book values existed, but concluded that the value did not reside in the trademark. To some extent, we agree with both parties' experts. Somewhere in between their positions lies the correct answer. Neither the trademark nor the

other intangibles represent the entire amount of any excess over the shareholders' equity.

The evidence supports a finding that the know-how and system in place that facilitated the ability to make timely and efficient deliveries is at least as important as the name "DHL". The parties' experts attempted to use professional and "scientific"-appearing techniques to compute and reach their conclusions; they exercised substantial latitude in selecting the variables that control the outcome. There is no exactitude to their theories or methodology. In each instance, their results appeared to depend on variables, the estimate of which seemed to favor the party they "represented".

Petitioners rely on examples of companies that sought to purchase infrastructure and placed no emphasis/value on the trademark of the target company. In that regard, one particular potential buyer of DHL entities or assets was not interested in acquiring the DHL name and intended to phase it out over approximately 1 to 3 years. That, however, does not mean that the DHL name had no value. In that context, the potential buyer already had a name (United Parcel Service or UPS) that was better known domestically, and possibly internationally, than DHL. Its focus was access to the international document and package delivery market by the acquisition of the DHLI network infrastructure and ability to deliver.

The above-referenced potential buyer did not intend to use its own name initially. Obviously, the DHL name recognition, at least during a phase-in period, was necessary for purposes of continuity of customer patronage and was quite valuable in that respect. Once the also well-recognized name was transitionally introduced over time, the customer base could be maintained to the extent possible. To a buyer without name recognition, however, the "DHL" name would have greater value because of the buyer's complete lack of customer recognition and the cost of enhancing or developing a new name and/or image. It is the value to such a willing buyer that we must consider. Obviously, if a buyer already has a more valuable trademark with better public acceptance, that would not be a comparable, interested, or willing buyer.

To a great extent, the parties experts' (especially petitioners') support our factual findings that the infrastructure, in the context of these cases, is at least as important as the name. Of course, petitioners' experts' opinions minimized the role of the name and emphasized the role of the infrastructure or the ability to deliver the service. Conversely, the effect of respondent's experts' reports was to minimize or ignore the importance of the infrastructure or the ability to deliver the service.

With respect to the parties' experts whose opinions placed a value on the trademark, they all relied on a relief-from-royalty

analysis to reach their conclusions.  We were not surprised that,
using the same methodology, they reached results on opposite ends
of the spectrum and that the results each reached favored the
party that paid his fees.[18]  The difference in the values
advocated lies in the differing assumptions and variable factors
used by each expert in his analysis.  Respondent's experts
premised their choices of rates and factors on beliefs that the
DHL name had high marketplace recognition for quality and had
become an important factor in the success of the DHL network and
constituted a desirable and valuable asset.

One of respondent's experts began his computation by
conducting a discounted cash-flow analysis to determine whether

---

[18]  Cf. Nestle Holdings, Inc. v. Commissioner, 152 F.3d 83
(2d Cir. 1998), revg. and remanding T.C. Memo. 1995-441.  That
case involved the valuation of trademarks and trade names, and
the court described the relief-from-royalty method as follows:
      Underlying this methodology is the view that the only
      value a purchaser of a mark receives is relief from
      paying a royalty for its use.  Using this model, the
      fair market value of a trademark is derived by
      calculating the net present value of the stream of
      royalty payments from which the purchaser of a mark is
      relieved.  This stream is calculated by (i) determining
      if the trademarks are profitable, or capable of being
      licensed, (ii) picking a royalty rate for each
      trademark, and (iii) multiplying this rate by the
      estimated revenue stream of the product associated with
      the mark.  * * *

Id. at 87-88.  After describing the relief-from-royalty
methodology, the Court of Appeals expressed disagreement with its
use in arriving at a trademark's fair market value because, in
the court's view, it understates trademark value.  Any appeal
from our decision in these cases would be to the Court of Appeals
for the Ninth Circuit.

sufficient cash-flow existed to warrant allocation of income to the trademark. He used financial information and projections that came from petitioners and their advisers, some of which were adjusted from yearend to the valuation date on July 9, 1990. Then, he made adjustments for taxes, using a 30-percent rate worldwide and adjustments for capital expenditures (5 percent of revenues) and depreciation and amortization (3 percent of revenues). Finally, networking capital additions were projected at 10 percent of incremental revenues in each projection year. He then proceeded to determine the fair market value of the DHL network as the sum of the present values of the available cash-flows in the projection period plus the present value of cash-flows expected beyond the projection period at a 6-percent growth rate. Finally, he capitalized the "residual period cash flow" using a 12.5-percent discount rate. That computation resulted in a 1990 total asset value of all DHL companies of $1.2 billion, equity of $630 million, and an amount that was attributed to intangible assets of $520 million.

There is no question that the DHL network was successful and that it had value over and above the shareholder equity. Although certain of respondent's expert's assumptions were generous and resulted in the inflation of value, overall we can accept that there was a reasonably large amount of value in excess of the equity reflected in the network entities. The more

critical question is to which intangible the excess is attributable.

Next, using a relief-from-royalty methodology, respondent's expert opines that $287 million should be attributed to the DHL trademark for 1990. He surveyed a wide range of businesses and found a broad range of royalties for trademark use of .7 to 10 percent. He settled on a 1-percent royalty rate and also assumed a 30-percent income tax rate and 6-percent growth rate. A 12.5-percent discount rate was applied in order to reach his result.

Respondent's other expert, after discussing several methods, chose an income approach he called "other anticipated value approach", in which he quantified the value of increased benefits in conjunction with the relief-from-royalty method (discounted cash-flow model). He described the "other anticipated value approach" as one that quantifies economic benefits accruing to an asset that may not be reflected in other income approaches, including marketing cost savings, operating synergies, lower costs of funds, etc. This benefit is supposedly measured in the form of incremental cash-flows that the expert believes are "not necessarily the result of excess earnings or avoided royalties." He then proceeded to explain that the quantification occurs by a cash-flow analysis reduced to a present value by means of a discounted cash-flow technique. Finally, it was pointed out that the "other anticipated value approach" is used in conjunction

with one or more other income methodologies, in these cases the relief-from-royalty approach.

Our analysis of this expert's approach reveals little difference in methodology or approach from that used by respondent's expert who relied solely on the relief-from-royalty approach. The distinctions that made a difference between the first expert's $287 million value and this expert's $327.5 million value for 1990, for the most part, are attributable to a somewhat different choice of assumptions. To reach $327.5 million, this expert used a 3.6-percent long-term growth rate, a 30-percent tax rate, a 12.21-percent discount rate, and a 1.15-percent royalty rate.

Petitioners' valuation expert, as a premise for his valuation, accepted as a fact or used as a base "(1) licenses actually granted by * * * [DHL] and DHLI; and (2) the arm's-length negotiation that resulted in an established royalty in * * * [the parties' agreements]." So, for example, he accepted the .75 percent royalty rate that was to begin in 2007 after the end of the 15-year royalty-free period. He also accepted as fact or a basis for his valuation that DHL and DHLI had never required a royalty in their relationship. Because we have already found that these transactions were not necessarily in all respects at arm's length, petitioners' expert's approach is flawed in its premises.

Petitioners' expert valued the DHL trademark using separate assumptions for the domestic and foreign portions of its value. Using a .31-percent royalty rate (based on a 14.1-percent discount rate to the .75 percent rate agreed to by the parties beginning in 2007), future revenue estimates, a 7.6-percent growth rate, and a 14.1-percent weighted average cost of capital and/or discount rate, he concluded that the U.S. trademark rights had a maximum value of $24.2 million. Using a .31-percent royalty rate, future revenue estimates, and a 13.4-percent discount rate, he concluded that the non-U.S. trademark rights had a maximum value of $31 million. As noted above, that results in a worldwide value of $55.2 million for the DHL trademark.

Thus, each of the trademark valuation experts has used assumptions, rates, and factors that were useful in reaching the grossly disparate amounts to "assist" the Court as a fact finder in these cases. In particular, however, we feel that respondent's experts have used more reasonable rates and factors, and their assumptions and approach are not as flawed as petitioners' expert's because of his acceptance that the transaction was at arm's length. We find it peculiar that petitioners' expert could expect to derive an independent fair market value by accepting the parties' values and rates, because his objective was to reach a fair market value. However, petitioners' expert accepted rates used in the transaction under consideration and then reduced their effect by discounting them

to a present value.  That approach does not serve to assist the Court in measuring whether the parties were at arm's length and/or whether the value they used was a "fair market value".  Petitioners' expert's approach to valuation begs the question and is fatally flawed.

We are not constrained to follow the opinion of any expert when the opinion is contrary to our own judgment.  We may adopt or reject expert testimony, whichever in our judgment is most appropriate.  Helvering v. National Grocery Co., 304 U.S. 282, 295 (1938); Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285.  We are not limited to choosing the opinion of one expert over another but may extract relevant findings from each in reaching our own conclusions.  Chiu v. Commissioner, 84 T.C. 722, 734 (1985).

Although respondent's experts' approaches were more reasonable in terms of the rates used, we do not agree that the value they have determined can be isolated as being attributable to the trademark.  In reaching that conclusion, we have, to some extent, relied on petitioners' experts, who opined that the DHL network has value, over and above the stated equity, that should be attributable to intangibles other than the trademark.  In particular, we find persuasive the concept that the DHL network enjoyed an intangible benefit from its existing infrastructure and operating know-how that created a "barrier to entry" of others into the same marketplace.  That principle was borne out

when DHL attempted to expand its domestic market share and, to some extent, was unable to compete with the established market leaders which had operating cost-effective infrastructures in place.  That same phenomenon occurred when a successful leader in the domestic delivery market attempted to break into the European market.  In that instance, it was the DHL network in place in foreign countries that, to some extent, limited the competitor's market entry success.  Finally, in some circumstances it has been shown that the trademark or name is of lesser value to a firm with an established trademark or name that wishes expansion and, ultimately, needs only the infrastructure and know-how to be successful.  Accordingly, we are convinced that intangibles, other than the trademark, account for some portion of the income benefits that have been estimated by the parties' experts.

In the same manner as we have disagreed with respondent's experts' opinions that all the value of intangibles should be attributed to the trademark, we likewise disagree that all or substantially all of the excess or intangible value should be attributed to nontrademark intangibles.  The answer lies somewhere in between.  Some of the factors we have considered include the fact that the $50 million amount set by the foreign investors in their initial offer was not based on value but instead was intended to bolster DHL's financial condition so as to maintain it as a viable part of the DHL network.  The reduction from $50 to $20 million was not based on the objective

reality of trademark value but was more motivated by business and tax planning considerations between parties. Those parties were attempting to negotiate a result or solution where the existing shareholders would receive some return on or redemption of their capital holdings, and the foreign (or new) investors wished to find a synergetic enhancement of their existing international airline and freight capabilities.

The fact that the DHL shareholders may have countered with a $100 million offer in this setting may reflect the value placed on the trademark asset by its owners but is again tempered by the type of relationship that was being formulated and the needs of the parties. Essentially, the DHL shareholders, after failing to strike a deal with a prior potential merger partner, were more motivated or determined to find a partner to resolve the financial and marketplace problems they confronted. After extensive negotiations with the foreign investors, the DHL shareholders were confined to a fixed maximum sale price that the foreign investors steadfastly refused to move from on several occasions. The foreign investors' rigidity on price eventually resulted in a cessation of negotiations and discussions. Ultimately, the parties were willing to vary prices of individual assets (e.g., reduction of the trademark price from $50 to $20 million) without changing the total price of the transaction. In that environment, it is less certain that the offers and

counteroffers represented, as to each individual asset, a "fair market value."

The parties' experts have placed us in an environment where it is more difficult to precisely value the trademark within the universe of intangibles that may account for the income benefits enjoyed by the DHL network and other attributes that may affect the value of the trademark. We must, however, decide the value of the trademark as a stand-alone asset and accordingly segregate its value from those of other intangibles. Petitioners have steadfastly held to their primary position that the trademark had a $20 million value and, at most, there is a $50 million ceiling on value. They maintain that the transaction was at arm's length and/or that the involvement of the foreign investors caused an environment where the agreed-to prices represent fair market value. We have concluded that petitioners' premise cannot be sustained. Petitioners have also allowed the question of whether Bain's $20 million "comfort letter" was for the worldwide rights and other related matters to remain murky. For example, petitioners' experts have attempted to show that intangibles other than the trademark were responsible for DHLI's success in the marketplace. Those "other intangibles", however, have not been clearly defined, and no specific value(s) were assigned to them. Respondent has not provided any assistance regarding any intangible other than the trademark and takes a position diametrically opposed to petitioners'.

We have been convinced that, to some extent, the success of the DHL worldwide network is attributable to name recognition and, to some extent, to cost, know-how, and other benefits attributable to the operating infrastructure in place. The parties have left us with a blunt tool with which to cleave the trademark from the other intangibles. The extreme differences in the parties' experts' results and variables have not helped to fine-tune our thinking. We accept respondent's approach to measuring the intangibles and conclude that the value of all the unbooked intangibles is $300 million. On the basis of our best judgment and after considering the record and opinions of all experts, we conclude that the worldwide rights to the trademark had a $150 million value as of 1990, without considering any impairment to the quality of DHL's ownership.

Our valuation considerations, however, do not end here because DHL's ownership of the worldwide trademark is subject to imperfections and open to question. We must consider those imperfections and factor them into the value that a willing buyer would pay. It is axiomatic that a willing buyer would not pay full value to a seller whose ownership of the asset is, in any manner, questionable. Although we have found that, as between DHL and DHLI, the license agreement was sufficient to place worldwide ownership in DHL, as a legal and technical matter, there may be problems in asserting DHL's rights to the trademark in more than 100 foreign countries where the trademark has been

registered in DHLI/MNV's names without reference to DHL. To a potential buyer, imperfections in DHL's trademark ownership (e.g., the foreign registrations) present potential legal problems and possible controversy, delay, and litigation expense. There is no question that these circumstances would have a profound and substantial effect on value.

We also recognize that the international portion of the DHL network was more successful than the U.S. portion, and, on the basis of the financial data presented and other indications in the record, we would conclude that about two-thirds of the value of the trademark was sourced in its value outside the United States. With a $150 million worldwide value, we find that $100 million was attributable to the portion of the network outside the United States.

Here again, the parties have failed to provide guidance with respect to the effect of DHL's ownership imperfections on the value of the trademark. The parties argued that DHL either did or did not own the worldwide rights to the trademark. The parties' reasons for their positions caused our holding that DHL owned the worldwide rights, but that the ownership was, in some ways, imperfect. The all-or-nothing approach of the parties does not adequately address any discount that may be appropriate to account for the ownership defects. An imperfect title or cloud on ownership would result in a marketability discount.

A marketability discount is generally thought to be necessary where the buyer may incur out-of-pocket expenses or other costs due to some aspect or defect in the asset being purchased.  For example, in an arm's-length transaction involving unlisted stock, there would be a significant discount reflecting the out-of-pocket expenses or other costs to prepare a security for public sale or to compensate the buyer of an unmarketable security for its lack of liquidity.  See Estate of Hall v. Commissioner, 92 T.C. 312 (1989).  Any cloud on title or ownership of property, "no matter how slight, will have a negative effect on the value of the property."  Adams v. Commissioner, T.C. Memo. 1985-268.  In Adams, the fair market value of a bombsight was decided to be $75,000 and was discounted by $10,000 (13.33 percent) for what appears to be a minimal cloud on the taxpayer's title.  In certain cases involving the value of shares of stock where there was question about the legal effect of certain terms or attributes of the stock, the stock value was discounted to, in part, reflect the legal questions and the potential for litigation and costs attendant thereto.  See Estate of Newhouse v. Commissioner, 94 T.C. at 230-233; Estate of Reynolds v. Commissioner, 55 T.C. 172, 193-195 (1970).

With respect to the DHL trademark outside the United States, although as between DHL and DHLI, the ownership was in DHL, the trademark had been registered in some 195 countries in DHLI's, MNV's, or their subsidiaries' or agents' names without mention of

DHL's interest.  A buyer could be financially burdened with perfecting its right to those registrations in some or all of the 195 countries.  The potential for delay, expense, inconvenience, etc. could be immense and would present a huge potential for out-of-pocket expenses or other costs to a potential willing buyer.

To adequately reflect those legal problems and potential costs, a 50-percent marketability discount is appropriate. Because the international portion of the DHL network produces about two-thirds of the business and/or profit, $100 million of the $150 million fair market value of the DHL trademark can reasonably be attributed to that portion.  Applying a 50-percent marketability discount to the $100 million foreign portion results in a discounted value for the DHL trademark of $100 million worldwide, and we so hold.

1.  Effect of Section 482 Regulations on Allocation of Value

Next, we consider the parties' collateral arguments concerning the amounts allocable under section 482 and underlying regulations.  Petitioners rely on a portion of the regulations that provide that when one member of a controlled group transfers intangible property to another member of the group, the district director may make "appropriate allocations to reflect an arm's length consideration for such property or its use."  Sec. 1.482-2(d)(1)(i), Income Tax Regs.  More specifically, petitioners argue that the district director may not make such an allocation unless or until the "developer" of the intangible property has

transferred it to another member of the controlled group.

Petitioners rely on the following language in the regulation:

> In the absence of a bona fide cost-sharing arrangement (as defined in * * * [sec. 1.482-2(d)(4)]), where one member of a group of related entities undertakes the development of intangible property as a developer within the meaning of * * * [sec. 1.482-2(d)(1)(ii)(c)], no allocation with respect to such development activity shall be made * * * until such time as any property developed, or any interest therein, is or is deemed to be transferred, sold, assigned, loaned, or otherwise made available in any manner by the developer to a related entity in a transfer subject to the rules of this paragraph.

Sec. 1.482-2(d)(1)(ii)(a), Income Tax Regs.

Petitioners contend that the application of this regulation requires the determination of what intangible property was developed, which entity was the developer within the meaning of section 1.482-2(d)(1)(ii)(c), Income Tax Regs., and whether the developer transferred the intangible property to a related entity. Petitioners argue that DHLI was the "developer" of the DHL trademark outside of the United States and, accordingly, that portion should not be allocated or reallocated to petitioners. Petitioners note that the application of these regulations is not dependent upon ownership.

Respondent argues that petitioners' proposed application of the so-called Developer-Assister Regulation is factually and procedurally incorrect in these cases. Respondent contends that the facts here show that DHL was the developer of the trademark and that there was no cost-sharing agreement between DHL and DHLI. Respondent points out that DHL licensed the trademark to

DHLI under the 1974 MOA and subsequent amendments and that petitioners have failed to show that any expenditures incurred by DHLI were more than would have been incurred at arm's length under those circumstances so as to trigger the need for an allocation under the regulations.

Our review of the regulations and some of the examples cited therein lead us to the conclusion that petitioners' interpretation does not work when applied to the facts in our record. First, there was no specific cost-sharing agreement with respect to development, enhancement, or maintenance of the DHL trademark. Petitioners have presented evidence that, over a period of years, DHLI spent substantially more on advertising than DHL. We have no way of measuring those expenditures' effect on the value of the trademark. That is especially so where petitioners' experts, in contradiction to petitioners' argument on this point, opined that the trademark has limited value and that the excess value of DHLI that may be indicated is attributable to intangibles other than the trademark. Having found a value higher than what petitioners argue was the limit, petitioners argue that DHLI is the developer of the non-U.S. portion and is responsible for the value we have found. Petitioners then contend that respondent should have reduced any adjustment to DHL based on an arm's-length or fair market value by the amount attributable to DHLI in developing or assisting in developing the non-U.S. trademark.

Overall, petitioners have not carried their burden of showing the requisite fact pattern for the relief they seek--reallocation/reduction for the international portion of the trademark value. To some extent, our reduction of the trademark value from $150 million to $100 million accounts for DHLI's efforts in registering and perfecting the trademark rights.

The related parties' relationship regarding the use of the DHL trademark was not a textbook example of a licensing agreement, but it was sufficient to bind these related parties and to effectuate control over the use of the trademark. There was no agreement or evidence of an agreement to permit DHLI's separate development of the DHL trademark other than as a licensee. DHL employees and/or officers did not agree, with limited exceptions, to DHLI's use or registration of the trademark in its own name. Petitioners argue that the subject regulations are not concerned with ownership, but, in the same context, also argue that a trademark may be owned by different interests and separately owned in different countries. We have already addressed this question in considering the trademark ownership.

Next, petitioners rely on language in section 1.482-2(d)(1)(ii)(c), Income Tax Regs., which provides guidance as to some of the factors to be considered in determining which member of a group of related entities is a developer, as follows:

> Of all the facts and circumstances to be taken into account in making this determination, greatest weight

shall be given to the relative amounts of all the direct and indirect costs of development and the corresponding risks of development borne by the various members of the group * * *.  * * * Other factors that may be relevant in determining which member of the group is the developer include the location of the development activity, the capabilities of the various members to carry on the project independently, and the degree of control over the project exercised by the various members.

In this regard, petitioners argue that DHLI bore the costs and risks of registering, protecting, and promoting the trademark outside the United States.  Respondent counters that petitioners cannot isolate the registration of the trademark outside the United States as making DHLI the developer.  Respondent explains that DHLI is a licensee, and there has been no showing that the costs incurred for registration and/or enhancement of the trademark were more than a licensee would have expended at arm's length.  In addition, respondent points out that the DHL network, at least in the customer's or the public eye, was a single network and that, therefore, any enhancement was not readily segregable for purposes of allocation.  Respondent also questions which of the DHLI/MNV entities bore the cost of advertising or marketing the trademark outside the United States.  In that connection, it was the international operating subsidiaries, and perhaps agents, that bore those costs in their respective countries, and they were mostly MNV subsidiaries.  Finally, we cannot ignore the paradox of petitioners' argument.  How can it be that DHLI spent hundreds of millions of dollars developing (advertising) the DHL trademark outside the United States, but

the parties to the transaction reached an "arm's-length" value of $20 million?

We find, on this record, that DHL established the trademark and is the developer within the meaning of the regulations. Even if DHLI had, to some extent, assisted in developing the trademark, petitioners have not shown that DHLI expended any more than an arm's-length amount in connection with a licensee's use, development, enhancement, or maintenance of the trademark. More significantly, the DHL network is a related group of entities that pursued the expansion of the network in concert. Petitioners have attempted to mix the registration and advertising costs. The mere filing of the registrations does not make DHLI the developer of the trademark. Moreover, the advertising, both within and without the United States, was promoting or marketing DHL's worldwide network. Customers in any country were intended to understand that their item could be delivered anywhere in the world, including the United States, Europe, the Far East, etc. Accordingly, advertising in one part of the world easily could have generated responsive business from the destination location.

Finally, we have not been provided with the means to evaluate the effect of the advertising on the value of the DHL trademark. In order to attribute or limit any or all of DHLI's and/or MNV's advertising costs solely to the value of the DHL trademark outside the United States, petitioners would have to

show that the effect of the advertising was so limited.
Petitioners have not shown that or that DHLI bore more of the
cost than an arm's-length licensee would have borne.[19]

Petitioners bear the burden of showing that existence of an
arm's-length price (value) or the absence of it in this instance
and have failed to do so.  See Sundstrand Corp. v. Commissioner,
96 T.C. at 354.  Accordingly, we hold that upon the sale of the
trademark by petitioners to DHLI/MNV and/or its successor(s) no
setoff or reduction of the $100 million value is warranted under
section 1.482-2(d)(1)(ii), Income Tax Regs.

### 2.  Respondent's Alternative Argument--the Alstores Doctrine

Our last consideration regarding the trademark valuation
involves respondent's alternative argument.  Respondent contends
that DHL's right to use the trademark after the sale represented
additional consideration received by DHL on the sale.  This
concept derives from Alstores Realty Corp. v. Commissioner, 46

---

[19]  Petitioners also made the argument that even if DHLI was
not considered to be the developer, the sec. 482 regulations
would permit respondent to allocate or set off the portion of
assistance DHLI provided toward the value of the intangible.  We
note that respondent has not attempted such an allocation or
setoff, and it does not appear that respondent may be compelled
to do so.  Even if such an allocation or setoff were appropriate,
as we have already explained, petitioners have not provided a
means by which such an allocation or setoff could be rationally
determined.

Petitioners have chosen to be bound by the less detailed and
inclusive 1968 version of the sec. 482 regulations that apply to
intangibles, but they used examples from the revised version to
support their argument on these points.  We suspect that
petitioners' resort to latter-day regulations was motivated by
the examples provided under the 1968 regulations which we found
did not fit the factual pattern presented in this record.

T.C. 363 (1966), and the companion case of Steinway & Sons v. Commissioner, 46 T.C. 375 (1966), and, hence, has been referred to as the "Alstores doctrine". The Alstores case involved real property that had been offered for sale for $1 million and was eventually sold for $750,000 with a rent-free leaseback to the seller. The Court held that the rent-free lease constituted additional consideration for the real property. The Alstores case involves a factual conclusion that additional consideration was received in the form of a rent-free lease.

Subsequent cases have made similar factual holdings. One such case involved a trademark and addressed the question of whether the transfer of the trademark was a sale or a license; i.e., whether the seller retained sufficient control or ownership over the trademark to render the interest sold a license rather than ownership. See Leisure Dynamics, Inc. v. Commissioner, 494 F.2d 1340 (8th Cir. 1974), revg. and remanding T.C. Memo. 1973-36. Here, respondent contends that petitioners sold the entire interest in the DHL trademark and retained no ownership interest, so that the 15-year royalty-free use by DHL was a license back that represented additional consideration.

Petitioners make several arguments in response to respondent's position. These arguments can be summarized as follows: (1) The form of the transaction reflects that DHL "reserved" the 15-year rights to use the DHL trademark in the United States; (2) section 1253(a) superseded the Alstores

doctrine as it relates to a trademark; and (3) the <u>Alstores</u> doctrine does not apply in the factual setting of these cases. We agree that the <u>Alstores</u> doctrine does not apply in the factual setting of these cases.

We have undertaken a complete analysis of the trademark value in these cases. We have decided that DHL owned the worldwide rights to the DHL trademark sold the worldwide rights, and that a section 482 adjustment should be made to DHL's 1992 income to reflect the adjusted fair market value of the trademark. Unlike the <u>Alstores</u> case, here the total value of the trademark has been considered, and the factual predicate for additional value does not exist. In <u>Alstores</u>, the Court, to some extent, filled the gap between the $1 million asking price and the negotiated $750,000 price with the value of the rent-free use retained by the seller. No such gap in value exists here. Accordingly, we hold that there was no compensation in addition to the value we have decided for the trademark.

## V. Allocation of DHLI Income to DHL From Imputed Royalties, Imbalance, Transfer, and Network Fees for the Period 1974 Through 1992

### A. Background

In addition to making allocations regarding the selling price of the DHL trademark, respondent also made adjustments allocating DHLI income to DHL attributable to royalties for use

of the DHL trademark for 1982 through 1992,[20] and for fees from DHLI to DHL for delivery services in the United States and for imbalances and transfers.  Finally, respondent determined that DHL should share in some of DHLI's income, which was determined in connection with DHLI's network fees.  As between DHL and DHLI, no royalties were charged for use of the DHL trademark, and, until 1987, no charge was made for the imbalance and transfer services.  Beginning in 1987, a cost plus 2 percent fee was to be charged to the party with the excess of shipments to the other and for DHL's transfers of DHLI's shipments through the United States.  Respondent contends that the 2-percent fee was inadequate to fully compensate DHL.

The proposed royalties and the transfer and imbalance items are necessarily interrelated and to some extent inversely proportionate.  The royalty rate must be tied to the value or income capacity of the trademark.  The fees for services for use of another company's infrastructure and ability to efficiently deliver packages is related to the physical facilities and the intangibles we have described as existing infrastructure and operating know-how.  We have been convinced that the trademark and the other intangibles are equally important in terms of the DHL network's income potential.  Accordingly, within the context of all intangibles, to the extent that the royalties are less

---

[20] Royalties for years prior to 1990 are relevant because they affect the computation of net operating losses carried into the taxable years before the Court.

important or valuable, the value of the infrastructure and operating know-how are more valuable.[21]

B. Royalties

DHLI did not pay DHL royalties before the 1990-92 transaction.  After the transaction and transfer of the trademark, no royalty was to be charged to DHL for the first 15 years and a .75 percent royalty was to be paid beginning 2007. One of respondent's experts, Keith Reams (Reams), applied a 1-percent royalty to the DHLI and MNV courier revenues to reach the following royalty revenue amounts:

| | |
|------|------------|
| 1982 | $2,399,000 |
| 1983 | 3,020,000 |
| 1984 | 3,940,000 |
| 1985 | 4,421,000 |
| 1986 | 4,938,000 |
| 1987 | 6,196,000 |
| 1988 | 8,195,000 |
| 1989 | 10,003,000 |
| 1990 | 11,920,000 |
| 1991 | 15,607,000 |
| 1992 | 12,490,000 |

Respondent's other expert applied a .75-percent royalty to the combined revenue of DHLI and MNV reduced by revenue from another entity, and, for the years 1991 and 1992, the imbalance fees from DHL to reach the following royalty revenue amounts:

---

[21]  Because of the complex interaction of these concepts, the relationship cannot be completely proportionate.  We only emphasize that there is some correlation between them.

| 1984 | $2,759,000 |
|------|-----------|
| 1985 | 3,239,000 |
| 1986 | 4,007,000 |
| 1987 | 5,156,000 |
| 1988 | 6,247,000 |
| 1989 | 7,305,000 |
| 1990 | 8,597,000 |
| 1991 | 10,536,000 |
| 1992 | 9,249,000 |

Petitioners argue, first, that no royalty was due from DHLI because it was the "developer" and, second, if we should find that DHL was the developer and/or owner of the trademark, no royalty would be due under an arm's-length standard.[22] Petitioners contend that this is so because of reciprocal benefits to both DHL and DHLI under the mutual agency agreement. Petitioners rely on a regulation that indicates that a cash

---

[22] Petitioners did not offer an expert who proposed a royalty rate for use of the DHL trademark. Petitioners' experts concluded that the trademark had little or no value and that, accordingly, no royalties are warranted. Another of petitioners' experts, in reaching a value for the trademark, used the parties' .75-percent rate (to begin in 2007) discounted to an amount that he believed would apply in 1990. The discounting was a present value approach. Although a present value approach has been held appropriate to reflect the time value of money, no meaningful reason was advanced for discounting a royalty rate for the passage of time. The value of a trademark or the amount of a royalty does not automatically increase or decrease with the passage of time.
Finally, one of petitioners' experts, an economist, provided his opinion of all respondent's statutory notice sec. 482 adjustments, including the trademark value, royalties, imbalance fees, transfer fees, etc. His critique of respondent's determinations was based on the information available to respondent at the time the notice was issued and not on the substantial amount of information that was exchanged by the parties after the issuance of the notice. This expert's report had some relevance to the question of whether respondent's notices of deficiency were arbitrary or capricious but is out of sync with the evidence the Court must evaluate on the basis of the record.

royalty is not the only arm's-length consideration for the use of intangible property; the transfer or use of other reciprocal rights can also represent fair market value.  That regulation, sec. 1.482-2(d)(2), Income Tax Regs. (1968), contains the following:

> To the extent appropriate, an arm's length consideration may take any one or more of the following forms:  (a) royalties based on the transferee's output, sales, profits, or any other measure; (b) lump-sum payments; or (c) any other form, including reciprocal licensing rights, which might reasonably have been adopted by unrelated parties under the circumstances, provided that the parties can establish that such form was adopted pursuant to an arrangement which in fact existed between them.  * * *

Petitioners also make two other arguments against respondent's royalty determination.  First, they argue that even though DHLI had contracted with independent agents in several countries for delivery service, those agents were allowed to use the DHL name without payment of a royalty.  Petitioners also cited a few other examples of royalty-free use of a name. Second, petitioners argue that a royalty payment from DHLI to DHL does not make economic sense.  In that regard, petitioners contend that DHL received a benefit in the form of DHLI's development of an international network into which DHL could make shipments.

Respondent counters, first, that DHLI was not the owner and/or developer of the trademark, and we have so held.  With respect to petitioners' other two arguments, respondent contends that petitioners did not produce credible, specific, or

appropriate comparables.  First, respondent suggests that no royalties were charged for the agents' use because it would have been subject to tax withholding in the agents' countries. Although respondent's suggestion appears to be a matter of speculation, the record does reflect that within the DHL worldwide network, the approach was to net out fees and to avoid charges between related and unrelated entities involved in the network.  Finally, respondent points out that petitioners' argument that DHL obtains other reciprocal benefits ignores the fact that DHLI received the same benefits from DHL.

Respondent's experts surveyed a wide range of businesses and found a broad range of royalties for trademark use from a low of .7 to a high of 15 percent.  Respondent's experts settled on .75- and 1-percent rates, although the average and median rates would have been much higher.  This gravitation to a lower percentage reflects both experts' recognition that a fair royalty would be a relatively low percentage in the setting of these cases.[23]

_____

[23]  We found some interesting paradoxes in comparing the parties and their experts with those in another case involving trademarks and arm's-length royalty issues.  Nestle Holdings, Inc. v. Commissioner, T.C. Memo. 1995-441.  In that case, the taxpayer was arguing for higher royalty rates, and the Commissioner was arguing for lower royalty rates.  The parties and, to some extent, the experts' reports in Nestle made very similar arguments to those made by the parties in these cases, except the arguments were made by the opposite parties.  For example, the taxpayer argued against zero royalties.  These paradoxes have no probative value in the cases now before the Court but only serve to further illustrate the "malleability" of the parties and their experts.

The applicable standard for determining an arm's-length royalty is the amount that would have been paid by an unrelated party for the same intangible property or its use under the same circumstances. Sec. 1.482-2(d)(2)(ii), Income Tax Regs. Under that same regulation, the best indicator would be transfers by the same transferor to unrelated parties involving the same or similar intangible property under the same or similar circumstances. If a sufficiently similar transaction involving an unrelated party is not available, the arm's-length amount is determined under the facts and circumstances test of section 1.482-2(d)(2)(iii), Income Tax Regs.

Petitioners offered examples of independent agents who were a part of the DHL network. Those agents were allowed to use the DHL name without payment or with a nominal payment (if local law required some payment) regarding the use of the DHL name. Respondent contends that the arrangement with the agents is not comparable because DHLI did not charge the agents a royalty in order to avoid the agents' countries' withholding tax. Whether respondent's contentions are correct or not, petitioners have not shown that the circumstances with DHLI and certain agents were sufficiently similar transactions and whether the agents were sufficiently "unrelated" parties so as to be used as the preemptive means of setting an arm's-length standard. All petitioners have done is show that no royalties were charged within the DHL network. That does not mean that no royalty

should have been charged. That does not show that zero is an arm's-length royalty for purposes of these cases. No similar transaction occurred outside the DHL network.

After reviewing the facts and circumstances and the experts' reports, we agree with respondent that a royalty would have been charged as between unrelated or arm's-length parties. As to petitioners' argument that DHL received some benefit other than cash, such benefits have not been quantified and/or shown to be within the range of arm's-length royalties. In that regard, it is petitioners' burden to show the royalty amounts and that they are arm's length, which they have failed to do.

The ability to deliver has value, and the recognized name that customers will seek out for delivery service also has value. The DHL name, as we have already found, has value, and its use likewise has value. It is our understanding, however, that the DHL name was not the only factor for the financial success enjoyed by the DHL network. In a like manner to our discount of the trademark value, we hold that a .75 percent royalty rate would be appropriate in the circumstances of these cases. We agree with respondent's experts' use of a royalty at the lower end of the range and find the .75 percent amount is more appropriate. Additionally, it is the rate used by the parties after the foreign investors collectively had a majority stockholding in the international portion of the DHL network. It

is also the rate used by one of respondent's experts and by petitioners' expert, albeit in a discounted form.

Respondent relied on the expertise of Keith Reams, who used a 1-percent rate to arrive at the royalties listed above. We approve Reams' approach, with the exception that the royalty rate should be reduced to .75 percent.

### C. Imbalance and Transfer Fees

Beginning in 1974, DHL performed delivery services in the United States for DHLI. The services took the form of the delivery of inbound items and the transfer of items passing through the United States from one foreign jurisdiction to another. Similarly, DHLI performed delivery (but no transfer) services for DHL in DHLI's international jurisdictions. Until 1987, no reimbursement (of any kind) was made to either entity. In 1987, procedures were implemented that provided that the party with excess outbound shipments to be delivered in the other's jurisdiction would pay a cost-plus-2-percent payment to the party that handled the excess shipments. For 1987 through 1990, DHL handled DHLI's shipments that were in excess of DHL's outbound shipments (to be delivered outside the United States). Similar provisions were made for payment for transfer items, which occurred only in connection with the movement of items through the United States, and so payments were to be made only by DHLI to DHL. Respondent does not question DHL's and DHLI's 1987 agreement or their methodology, but argues that imbalance

payments should have been made for years prior to 1987 for excess shipments (imbalance) and for transfer items handled by DHL for DHLI. As to the 1987 year and later, respondent contends that the 2-percent markup was not at arm's length and was inadequate to compensate DHL or DHLI.

Petitioners again argue that the arrangement between DHL and DHLI was commercially reasonable and within a range that would have resulted from arm's-length negotiations between unrelated parties. Petitioners argue that the approach used was comparable to the express mail arrangements between the U.S. Postal Service and other national postal administrations during the 1970's or about the same time as the reciprocity began between DHL and DHLI. Petitioners also cited one such arrangement between unrelated entities.

Respondent argues from a stronger position because of the 1987 implementation of a cost-plus arrangement for the excess or imbalance. Petitioners try to explain this away by contending that the circumstances extant at that time should not determine what was commercially reasonable in earlier periods. Petitioners also point out that DHL did not maintain detailed cost information before 1987.

The parties proffered expertise to the Court on these matters. Petitioners offered an economist who analyzed the imbalance and transfer fees between DHL and DHLI and an economist specializing in the economics of regulated industries, including

the U.S. Postal Service, who examined the reasonableness of the imbalance fees from the perspective of the postal community. Respondent proffered an economist to opine on an arm's-length markup percentage for imbalance and transfer services between DHL and DHLI and to determine the imbalance and transfer costs and fees for years prior to 1987.

First we consider the report of petitioners' expert, who used the practices of the postal community to analyze the reasonableness of the imbalance fees. Petitioners point out that their practice of no fees for imbalance and transfers was based on the postal system approach. Their expert explains that, initially, postal systems of the world accepted the premise that mail flows between two given countries essentially in balance; i.e., it is expected that each outgoing letter will engender an incoming reply. Consequently, there was a form of reciprocity. At some point, the postal community determined that the incoming-outgoing balance assumption was no longer valid. That recognition occurred in 1969 and evolved through 1989. Petitioners' expert states that DHL and DHLI recognized the need to change in the mid-1980's and was able to implement it only as of 1987. As of 1969, however, a convention among postal systems established a weight-based fixed or level rate of 50 centimes per kilogram of excess mail received, with a SwF2,000 threshold.[24]

---

[24] It appears that the monetary units used for the convention are Swiss francs.

As time progressed, the convention was modified for inflation and to take into account varying and more specific information and fees.

Respondent agrees with the postal system analogy and does not question DHL and DHLI's methodology, but contends that the postal community recognized that its basic assumption was no longer valid in 1969, whereas petitioners essentially ignored the imbalance until they were forced to change their imbalance or transfer practices. Respondent contends that DHL and DHLI changed their practices in 1987 only after those practices were brought into question by a regulatory agency and/or an administrative law judge.

We agree with respondent on this point--it was reasonable for petitioners to fashion their imbalance and transfer approach after that used in the postal community, but that does not explain why it was appropriate to wait until 1987 to address the imbalance. In addition, we cannot accept petitioners' argument that it would have been difficult to quantify any imbalance or transfers because of the manner in which their records were kept. There is no doubt that petitioners would have found some reasonable way (as respondent's expert did) to determine the imbalance or transfer costs if they were dealing with an unrelated third party with whom a reciprocal agreement existed. Accordingly, we proceed to decide the arm's-length percentage compensation that would have been charged by independent parties.

Petitioners' other expert, an economist, analyzed the transfer price between DHL and DHLI. Although DHL and DHLI applied their cost-plus 1987 approach for imbalances and transfers on a per-shipment basis times a weighted average delivery cost and percentage markup, petitioners' expert analyzed the cost for all reciprocal shipments and arrived at a different result from DHL and DHLI and from respondent's approach. By estimating a substantial cost differential between DHLI and DHL (larger for DHLI), petitioners' expert concluded that any adjustment for the imbalance, whether computed at cost plus 2, 4, or 15 percent markup, would result in a substantial adjustment in DHLI's favor for all years under consideration.

Respondent's expert used or accepted the same methodology as DHL and DHLI had used to compute the imbalance, but he used a 4-percent as opposed to the 2-percent markup that was used by DHL and DHLI. Respondent's expert concluded that there should be an imbalance adjustment for pre-1987 years and an increase in DHL's and DHLI's adjustment for the years where a 2-percent markup was used. Because respondent's expert used the same approach or methodology called for in the agreements between DHL and DHLI, we consider his report first, and then we will contrast and consider petitioners' expert's approach.

Although the taxable years before the Court are 1990, 1991, and 1992, respondent is able to determine section 482 adjustments to earlier years because of the existence of net

operating losses carried from the 1970's and 1980's that petitioners have claimed in the years before the Court. Accordingly, respondent seeks the allocation of imbalance and transfer costs and 4-percent markups[25] for the years 1979 through 1986 and increases in the markup rates for imbalance and transfer computations from 2 to 4 percent for 1987 through 1992. It should be noted that the imbalance for 1991 and 1992 resulted in a payment from DHL to DHLI. In that regard, respondent contends that the 4-percent rate should apply to that payment and an allocation made favoring petitioners. Respondent's pre-1987 proposed adjustments are larger because they include the cost and the markup, whereas the 1988 through 1992 adjustments cover only an increase in the markup percentage.[26]

Respondent's expert, an economist, by using information reported by DHL, including financial statements and annual

---

[25] Respondent used a 15-percent markup in the statutory notice determination.

[26] The adjustment for the years 1987 and forward where DHL and DHLI used a cost plus 2 percent markup are relatively small in that they usually represent the difference between the 2 and 4-percent markups. For example, the adjustment computed by respondent's expert (which represents respondent's trial position and represents a reduced markup percentage from 15 down to 4) for the 1988 tax year is $277,000 for the imbalance and transfers. That is so because respondent does not question the parties' approach and computation of the base (costs) to which the markup percentage is applied. In contrast, for years prior to 1987, DHL and DHLI did not address the imbalance, and the cost factor was not paid on the imbalance. This difference accounts for relatively larger combined adjustments for the imbalance and transfers ranging from $1.075 million for 1979 up to $12.480 million for 1986.

budgets, was able to find the number of outbound shipments for the years 1983 through 1990 and the inbound shipments for 1987 forward.  For 1983 through 1986, he assumed that inbound shipments grew at the same rate as outbound shipments.  For 1979 through 1982, no data were available, and he assumed that outbound and inbound shipments grew at the same rate as courier revenues, which were available.  The imbalances were calculated as the difference between inbound and outbound shipments.  Finally, average cost per shipment was available from 1987 through 1990 and reflects a downward trend from $11.64 in 1987 to $9.99 in 1990.  Information also showed that the cost per transfer shipment also fell from $5.05 in 1987 to $3.75 in 1989 and went up to $3.97 in 1990.  He therefore assumed that airline transportation costs were trending down and had been higher during the period 1979 through 1986.  To be conservative, he averaged the known imbalance and transfer costs to arrive at $10.96 and $4.38 as the amounts to be used for imbalance and transfer costs, respectively, for the 1979 through 1986 period.

Respondent's expert next used a comparable company approach to determine a markup of 4 percent on cost for imbalance and transfer shipments.  The five companies selected were clearly in the same business, and their net sales less operating expenses were used to determine an operating profit, which was divided by operating expenses to reach a markup percentage on costs.  The comparable period used was 1990 through 1992, and it produced

average markups ranging from a negative 6 percent to a positive 5.2 percent.  The median percentage was 4 percent, the amount used for all years by respondent's expert.

Petitioners do not dispute the information that respondent's expert derived directly from financial and business records but disagree with his estimation and extrapolation process to approximate or estimate the imbalance that existed in years for which no specific records were maintained by petitioners.  In particular, petitioners contend that growth in outbound shipment volumes cannot be determined by means of the growth rate in annual revenues.  Petitioners indicate that the relationship between DHL's growth rates should not be used to gauge inbound shipment growth, which relates to DHLI's business.  This approach, petitioners argue, does not accurately estimate actual results.  Petitioners also point out that respondent's expert was selective in his use of projection material in that he used 1987 data to project 1979 through 1983 figure estimates, rather than the more contemporaneous information that was available from 1984 through 1986.  Although the criticisms made by petitioners are numerous, petitioners have not offered a more accurate method of estimating the actual imbalances that existed during the years in question.  Respondent's expert attempted reasonably to compute

the imbalance and used accepted methodology, which petitioners have criticized but not shown to be incorrect or unreasonable.[27]

Petitioners also criticize respondent's expert's comparable approach in reaching a 4-percent markup based on comparable companies. They point out that the removal of one of the five comparables (Federal Express) drops the weighted average from 4 percent to 1.55 percent. Although petitioners are mathematically correct, they do not address the fact that Federal Express represents, by far, the largest share of the domestic market in which petitioners were engaged. Petitioners also complain that respondent's expert's comparables are taken from 1990 through 1992 information and should not be extrapolated back to years 1979 through 1988. Here, again, petitioners complain, but do not provide more timely or appropriate comparables. Respondent's expert has made adequate and uncontroverted explanations for his assumptions on this aspect.

As explained above, petitioners' approach to respondent's position on the imbalance adjustments is that petitioners' expert's total cost analysis would result in an imbalance requiring payment to DHLI in all years. If the Court decides that a section 482 adjustment for imbalance fees is warranted,

---

[27] Petitioners' expert did not directly address respondent's expert's approach but focused on a total cost approach, as opposed to an imbalance approach, that he projected would reflect that the "imbalance" actually favored DHLI during the years in question. We address petitioners' expert's report later in this opinion.

then petitioners argue that DHLI would be entitled to an setoff for its greater cost factor.  The proposed setoffs would more than obviate the adjustments respondent advances in this litigation.  Accordingly, we next consider petitioners' expert's report on this subject.

Petitioners' expert begins by an analysis of the arrangement between DHL and DHLI for imbalance and transfer shipments.  He concludes that their arrangement (cost-plus as opposed to a fixed-fee or flat-rate) is in accord with the postal system model and "is consistent with arm's length practice in the context of the overall, complex contractual relationship between DHLI and * * * [DHL]."  He then states, without explanation, that if the Court determines that DHLI and DHL are commonly controlled, then they should each receive from the other the costs incurred for delivering all documents and/or packages for the other, plus a normal return on those costs.  That, however, is not the agreement between the parties or the approach used in the postal system model.  The agreement of DHL and DHLI was to compensate only the party who delivered the excess number of shipments at a weighted average delivery cost of the person performing the service.  The weighted portion of the agreed formula is dependent on the types of items delivered; i.e., documents or packages/parcels.  A higher cost is usually attributed to the packages/parcels.

Petitioners' expert opined that DHLI delivery costs are greater than DHL's because of the higher airport costs, complication of delivery in foreign countries, and the greater distances. He concludes that the difference in delivery costs is so great that, without considering the excess shipments or imbalance, DHL should owe DHLI. The magnitude of the expert's approach is illustrated by the difference in a single year. For the 1990 year, under DHL and DHLI's agreement, DHL handled more shipments for DHLI than the reverse, and DHLI owed about $10.1 million, including the weighted cost and a 2-percent markup. Under petitioners' expert's approach, DHL would owe DHLI about $32.3 million, a difference of over $42 million or four times the amount agreed to by DHL and DHLI for a single year.

We cannot accept the premise or reasoning advanced by petitioners' expert for a "gross up" of the parties' reciprocal costs as representing an arm's-length relationship. Petitioners' expert seems to be contending that his approach is appropriate for controlled corporations, but he has not explained why it is representative of an arm's-length approach. Additionally, respondent has not questioned the cost approach used by petitioners for the imbalance, only the markup rate that was used.

The record here does not support petitioners' expert's supposition. The parties to the agreement did not intend or expect that one party or the other would always suffer the

imbalance.  As we understand the premise for the approach actually used, it contains the assumption that the imbalance would vary as between the parties as it did between the 1990 and 1991 years.  From reviewing the facts of these cases and some of the experts' reports, it is our understanding that independent (arm's length) parties who enter into reciprocal exchanges of services do so because of perceived benefits each gains from use of the other's facilities.  One possible reason for such a reciprocal agreement is to expand service available for customers and potential customers without the capital infrastructure costs that would otherwise be incurred.  Although one party's costs may be greater or less than the other's, that is not the basis for the reciprocity.  Ultimately, a reciprocal agreement envisions that compensation occur when one of the parties performs more services for the other than are received.  That is the case here, and petitioners' expert, although accepting that the approach of DHL and DHLI was at arm's length, devised an approach that ignored the parties' understanding.

In addition to the theory and substance deficiencies in petitioners' expert's report, respondent points out the following flaws:  (1) Many of the numbers for 1989 and 1990 are not supported in the record, and no analysis was provided as to how they were calculated; (2) the position is taken that petitioners' expert's estimated numbers were more reliable than DHLI's actual numbers, even though a large portion of DHLI's financial

information does not exist in this record; (3) the expert used 1991 and 1992 cost figures for DHLI which are different from those used by the parties and contained in the record; (4) the expert used a 15-percent markup (same as used in the notices of deficiency but different from the 4 percent advanced by respondent for purposes of litigation and 2 percent used by the parties) without analysis of comparable companies to determine what an appropriate markup should be, and respondent also points out that petitioners argued that the 15-percent markup used for the notice determinations was arbitrary and capricious; and (5) the expert's use of package or document weight is unjustified and does not comport with the parties' agreement that uses a weighted cost that accounts for the difference in costs between packages and documents, and therefore no further adjustment is necessary to the imbalance cost.

The record and most of the expertise provided by the parties support DHL's and DHLI's 1987 approach to the imbalance and transfers as one that is arm's length, and we so hold. Petitioners did not provide any other reciprocal arrangements with unrelated parties that were under the same or similar circumstances as those advanced by their expert. See sec. 1.482-2(d)(2)(ii), Income Tax Regs. Accordingly, we used a facts and circumstances approach to deciding an arm's-length markup. Sec. 1.482-2(d)(2)(iii), Income Tax Regs. Regarding the failure to account or pay for imbalances or transfers before 1987, we hold

that arm's-length and/or independent parties would have paid for
imbalances and transfers for all years as proposed by
respondent's expert, beginning with 1979.  We find that
respondent's expert's estimates of the costs are, in part,
supported in the record, and, in part, based on reasonable
assumptions.  More importantly, petitioners, who bear the burden
of showing an arm's-length rate and the amount of any services
performed by or between the controlled entities, have failed to
do so in the context of these cases.[28]

Concerning the 4-percent markup estimated by respondent's
expert and advocated by respondent, we hold that rate to be more

_____

[28] Petitioners complained at trial and on brief that they
should not be put in the position of rebutting or addressing the
opinions of respondent's experts and that they should be required
to address only respondent's determination in the notices of
deficiency.  For the most part, respondent's trial position is,
like petitioners', based on the record and expertise offered.  To
the extent that respondent's experts have reached different
amounts than respondent's determinations, the experts'
conclusions would result in reduced deficiencies for petitioners.
Finally, petitioners should not be heard to complain in this
manner when they are, to some degree, responsible for the
differences in respondent's trial position and the notice
determinations.  Petitioners resisted respondent's pre-notice
requests for information.  As previously pointed out in this
opinion, the movement of information from the parties, especially
from petitioners to respondent, was slow and dilatory.
Respondent's trial position has evolved with the receipt of
information from petitioners, which continued into the middle
portion of a lengthy trial.

Throughout the pretrial involvement of the Court, the
parties were required to define and explain their positions for
purposes of trial in numerous telephone conversations and in
written documents pursuant to orders and otherwise.  Accordingly,
there can be no claim of surprise or prejudice by either party on
this point.  In this setting, petitioners' attempt to limit the
arguments and evidence in these cases to the position of an
earlier day less-well-informed adversary must fail.

representative of an arm's-length rate than the 2-percent rate used by DHL and DHLI.  Our decision is based on the comparables used by respondent's expert and our holding that less of the intangible value resides in the trademark and that the value must therefore reside in other assets and intangibles.  As advocated by petitioners, that value should reside in the ability to deliver packages efficiently and effectively.  We agree that the know-how and operating ability constituted an important intangible aspect that was, in some part, responsible for the success of the DHL network.  Accordingly, the use of those valuable intangible assets would warrant a fair return.  A higher markup was not advocated by either party in connection with the type of reciprocal agreement as the one between DHL and DHLI.  In that regard, petitioners' expert used, among others, a 15-percent markup in the context of a total cost reimbursement environment, which, as we have explained, does not represent the transaction under consideration and does not represent an arm's-length arrangement in the context of these cases.  Accordingly, we sustain respondent's trial position for cost plus 4 percent on imbalances and transfers for 1979 through 1992.

### D. Network Fee

Respondent determined that one-half of the network fees that DHLI collected from agents and subsidiary operating companies should be allocated under section 482 to DHL.  Based on

respondent's expert's report, the adjustment for the 1985 through 1992 years would total $96.772 million.

Respondent's position on this allocation is that the DHL shareholders collectively controlled the entities and that the stated ownership did not represent the true relationship between the shareholders. Respondent builds on this supposition by contending that the shareholders would not divide the network operating profits on the basis of stock ownership. According to respondent, because the DHL shareholders' stock ownership did not represent their actual interests, the shareholders would divide profits based on their actual interest related to the DHL network as a whole. Using this type of analysis, respondent reaches the conclusion that the shareholders' "true economic arrangement was akin to a partnership." The next step in respondent's theory involves a quantum leap from the shareholders' relationships to each other into the relationship between the corporate entities. Respondent's ultimate conclusion is that DHL, DHLI, and MNV were engaged in a joint venture. Using this conjecture-based analysis, respondent proposes that his proffered expert's opinion should be followed to allocate a part of DHLI's income to DHL. Respondent's expert proposed to combine the financial results of all three entities (DHL, DHLI, and MNV) and to allocate their combined profits in proportion to the cost borne by each, on the basis of a similar type of analysis.

Petitioners contend that respondent's proposed network fee adjustment and joint venture theory are baseless, without substance considering the record, and inoperable as a matter of law. We agree with petitioners. We have found as facts that DHL and DHLI were allowed to operate and develop separately in their own geographical markets. The separate foreign operation and use of DHLI was due to regulatory concerns, though it may have been nurtured because of tax advantages. The business entities within and without the United States were allowed to operate independently in terms of their marketplace but were commonly controlled within the meaning of section 482. In that environment, DHLI, over time, was more successful than DHL. That is not to say that DHLI was allowed to become more successful by the DHL shareholders. DHLI, through the 1980's, became the leader in its market, and DHL was generally unsuccessful in its attempt to increase its market share. In this particular context, the success of DHLI was not the result of the manipulation of income or expense or the lack of arm's-length dealings.

DHL and DHLI were separate in order to meet the legal requirements for CAB certification. Whether the shareholders honored that separation in their shareholder relationship is a question that would affect their income from any sale of the entities or in the division of residual corporate income. The shareholders' hypothecation of shareholding ownership should not,

per se, govern the question of whether the income of the corporations was being earned at arm's length.

In a similar vein, the Commissioner has not met with success when using section 482 to allocate income to a taxpayer who could not legally receive said income. Commissioner v. First Sec. Bank, N.A., 405 U.S. 394, 403 (1972); Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 339 (1990), affd. 961 F.2d 1255 (6th Cir. 1992). Here, DHL was divided into domestic (DHL) and foreign (DHLI) operating entities to comply with CAB requirements. Ultimately, that division resulted in better income performance for the foreign entity (DHLI). The purpose of the division was not to shift profits artificially.

Although we found it appropriate to look to the manner in which the shareholders divided the proceeds from the 1990 to 1992 transaction for purposes of deciding whether there was section 482 common control, it is not appropriate to use that as a premise for respondent's tortured syllogism.

As a factual matter, we are unable to find that there was artificial shifting of net incomes of controlled taxpayers with respect to DHL's and DHLI/MNV's profits. Petitioners have shown that, for the most part, DHLI's success was attributable to its own actions and operations and not to DHL's efforts. Accordingly, respondent is without authority to attempt to place them on a parity with uncontrolled, unrelated taxpayers. Hospital Corp. of Am. v. Commissioner, 81 T.C. 520, 594 (1983),

and cases cited therein. The separate existence of DHL and DHLI/MNV was not, in this context, used to facilitate the artificial shifting of the net incomes in the form of the network fees or in the context of respondent's supposition of a partnership or joint venture. Accordingly, we hold that respondent's so-called Network Fee section 482 determination is not sustained because petitioners have shown an abuse of respondent's discretion. See Paccar, Inc. v. Commissioner, 85 T.C. at 787.

## VI. Are Petitioners Entitled to Setoffs to Any of the Section 482 Allocations That Have Been Sustained?

Petitioners contend that they are entitled to setoffs for two types of items. One concerns a 1984 sale of LaserNet from DHL to DHLI, and the other concerns the total cost theory developed by petitioners' expert concerning the imbalance adjustment. Petitioners rely on section 1.482-1(d)(3), Income Tax Regs., which provides that if the district director makes a section 482 allocation,

> The district director shall also consider the effect of any other nonarm's length transaction between * * * [the controlled parties] in the taxable year which, if taken into account, would result in a setoff against any allocation which would otherwise be made, provided the taxpayer is able to establish with reasonable specificity that the transaction was not at arm's length and the amount of the appropriate arm's length charge. * * *

As to petitioners' and their expert's theory on imbalance based on total costs for services as opposed to costing only the excess in a reciprocal service arrangement, we have already held

that it does not represent an arm's-length approach.  In other words, petitioners' suggested approach for total cost is not "any other nonarm's length transaction".  Instead, it represents nothing more than an alternative position being argued for purposes of trial.  Accordingly, further consideration of whether respondent should have permitted such a setoff in accord with the above provision of the regulation is unnecessary.

Concerning the LaserNet item, petitioners offered an expert in software technology who opined that the LaserNet technology sold by DHL to DHLI in 1984 had a value of between $1 million and $1.45 million, rather than the $14.5 million price paid by DHLI. Accordingly, petitioners seek a $13.05 million setoff to the 1984 allocation.  Respondent's 1984 imbalance, transfer, and royalty allocations, as advanced at trial, are less than the proposed setoff amount, and accordingly no 1984 adjustment would result if petitioners are sustained on this item.  As a factual matter, we have found that a major purpose of the sale of LaserNet from DHL to DHLI was to raise capital for DHL, which was engaged in expansion and experiencing financial difficulties.

The peculiarity of this situation is that petitioners, who first argued that they were not commonly controlled during 1984 and that all transactions between the entities were at arm's length, now admit and urge that this transaction was not at arm's length; i.e., that more than fair market value was paid as a pretense for a capital contribution from DHLI to DHL at a time of

financial need.  The purpose of the above-quoted regulation, however, is to keep the Commissioner from missing or selectively choosing only those allocations that would increase a taxpayer's income.

A procedural point also has surfaced concerning the setoff question.  Section 1.482-1(d)(3), Income Tax Regs., provides for taxpayers to give notice to the district director as to the basis of claimed setoffs within 30 days of an examination report that notifies the taxpayer of proposed adjustments.  One stated purpose for this provision is to allow the examining agent sufficient time to correct erroneous allocations.  See Rev. Proc. 70-8, 1970-1 C.B. 434.  Clearly, the notice requirement, in the context of the pre-statutory-notice period, is to facilitate complete or thorough determinations.

Respondent, however, did not provide petitioners with an examination report before the issuance of the notices of deficiency.  Accordingly, petitioners could not give notice of setoffs to the district director within 30 days of an examination report.  In this situation, petitioners argue that section 1.482-1(d)(3), Income Tax Regs., has no application.  Petitioners did provide notice of claimed setoffs after respondent issued the deficiency notices.

Respondent, without commenting on the regulatory requirement, complained that petitioners waited until the last possible moment to raise the issue of valuation of the technology

it sold in 1984.  Respondent noted that petitioners blamed their failure to give notice on respondent's failure to explain the adjustments in the notices of deficiency.  In that regard, respondent also noted that petitioners were provided, pursuant to the Court's requirement, a detailed and specific explanation of adjustments on October 28, 1996, about 3 months before expert reports were to be filed with the Court.  Petitioners' claim of setoff was made on January 31, 1997, at about the time of the submission of expert reports to the Court.

We agree with petitioners that the regulation should not be a procedural impediment to any appropriate setoff under these circumstances.  As to respondent's complaint about the timeliness of petitioners' notice, respondent has not argued that he was in any way specifically prejudiced by the timing of the notice.

Finally, we hold that petitioners are entitled to a setoff of respondent's 1984 section 482 adjustments that we have sustained.  The record reflects that DHLI never used the technology and that the technology did not have the type of value attributed to it in the 1984 sale of technology transaction between DHL and DHLI.  Petitioners' expert's opinion contains reasonable assumptions and comports with the record in these cases.  Accordingly, we find and hold that the amount of the setoff for the 1984 tax year equals the $13.05 million difference between the stated $14.5 million sale price and a $1.45 million

fair market value or arm's-length price of the LaserNet technology.

VII.  Section 6662 Penalties

For each of the 3 taxable years, respondent determined accuracy-related penalties under section 6662.  In particular, for each year, respondent alternatively determined that either the 40-percent gross valuation misstatement penalty under section 6662(h) is applicable or that the 20-percent penalty under section 6662(b) is applicable.  Section 6662(b) lists the types of underpayments to which the 20-percent penalty of section 6662(a) applies, including:  (1) Negligence or disregard of rules, (2) substantial understatements, and (3) substantial valuation misstatements.  Substantial valuation misstatements include determinations under section 482 where the reported price is 200 percent or more (or 50 percent or less) of the arm's-length price.  Sec. 6662(e)(1)(B).  Section 6662(h) imposes a 40-percent penalty on "gross valuation misstatements", which include determinations under section 482 where the reported price is 400 percent or more (or 25 percent or less) of the arm's-length price.  If section 6662 is applicable, the question of which valuation misstatement penalty (substantial or gross) applies is purely a question of computation.

No penalty may be imposed under section 6662 if reasonable cause exists and the taxpayer acts in good faith.  Sec. 6664(c).  Despite the general application of section 6664(c), Congress

included an additional reasonable cause and good faith exception to the section 6662(e) penalty for transfer pricing valuation misstatements. Finally, the substantial understatement penalty does not apply to understatements attributable to (1) items supported by "substantial authority" or (2) items that are "adequately disclosed" on the return. Sec. 6662(d)(2)(B). With respect to the section 6662 determinations, petitioners bear the burden of showing that the penalty does not apply. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989) (citing Bixby v. Commissioner, 58 T.C. 757, 791 (1972)).

Negligence includes any failure "to make a reasonable attempt to comply with the provisions of this title". Sec. 6662(c). A taxpayer may not be negligent where the taxpayer relies in good faith upon an appraisal in reporting a transaction. Petitioners argue that they relied in good faith upon Bain's $20 million appraisal of the trademark rights that DHL conveyed. Petitioners point out that Bain was well known to them and had worked on strategy and planning in connection with the UPS discussions, assisted in the UPS negotiations, and prepared the PLP costing model used by DHL and the PRISM costing model used by DHLI. Petitioners claim that they relied on Bain's background and expertise and that the reliance was reasonable, so they were not negligent in reporting the $20 million gain from the trademark sale.

Petitioners, in a footnote on brief, also presented the following case analysis:

> Sammons v. Commissioner, 838 F.2d 330, 337 (9th Cir. 1988), [affg. in part and] rev'g [in part] T.C. Memo. 1986-318 (no negligence when taxpayer relies on an appraisal that is at least "reasonably debatable"); McMurray v. Commissioner, 985 F.2d 36, 42-43 (1st Cir. 1993), [affg. in part,] rev'g [and remanding] T.C. Memo. 1992-27 (absent evidence of bad faith, expert valuation precludes negligence penalty, even if opinion given no weight in determining value). Further, courts are reluctant to find negligence where the transactions are complex and no clear authority exists. Kantor v. Commissioner, 998 F.2d 1514, 1522 (9th Cir. 1993), [affg. in part and] rev'g [in part] T.C. Memo. 1990-380 (negligence not found, no authority squarely addressing questions in issue); Foster v. Commissioner, 756 F.2d 1430, 1439 (9th Cir. 1985), [affg. in part and vacating in part] * * * 80 T.C. 34 [1983] (negligence not found; no clear authority; complex section 482 issues involved).

We did not find a factual fit with the cited cases or a reason to apply the same rationale under the factual findings we have made in these cases.

Additionally, respondent asks us to take cognizance of the familiarity of Bain to petitioners and their worldwide network. Respondent's argument implies that familiarity allowed petitioners and/or their representatives to cause a valuation that fit within their structuring of the transaction. Respondent contends that the Bain comfort letter had been manipulated by DHL's attorney/representatives to support a predetermined value. We have found that the parties did not respect the values of individual assets and, instead, worked together to reach an agreement within the context of a fixed offer price from the

foreign investors. In that context, the foreign investors placed a $50 million "value" on the trademark to infuse capital into DHL. Without first obtaining a valuation, petitioners' representatives reduced the value to $20 million for tax and other purposes. At one point, the DHL shareholders made a counteroffer of $100 million for the trademark. After all of that maneuvering, Bain was given the job of valuing the trademark and supported the $20 million figure. In this connection, respondent points out that, although the Bain "valuation" was in the record and testimony offered in connection with it, Bain was not offered as an "expert" in support of the $20 million value. In that connection, petitioners did offer several other experts who attempted to sustain the $20 million value.

Considering all of the above, we hold that it was not reasonable for petitioners to rely on (or more properly hide behind) the Bain appraisal or comfort letter. If the parties to the transaction had given the valuation to an independent valuation entity before any values being placed on the trademark by the parties and/or not advised the evaluator of a value, it might have been reasonable for petitioners to rely on such an appraisal.[29] As this trial has again demonstrated, parties can find experts who will advance and support values that favor the position of the person or entity that hired them.

---

[29] We would find it difficult to believe that Bain independently reached the same $20 million figure as the parties and/or their representative had already devised.

As to the royalty, the imbalance/transfer fee, and the "network fee/joint venture" allocations, petitioners argue that their reporting positions were reasonable and well founded. Respondent disagrees and contends that the corporate entities were manipulated by the shareholders. We agree with petitioners with respect to the imbalance, transfer fees, and network fee adjustments. Obviously, because we have decided that no network fee adjustment is appropriate, it will not be subject to the penalty. With respect to the imbalance and transfer items in the years before the Court, petitioners used what we have found was an arm's-length approach in computing the amounts paid for those items. For the years 1990, 1991, and 1992, the only difference between the reporting position and respondent's trial position is the 2-percent differential in the markup, which represented a relatively small difference.

With respect to the royalty reporting position, we have a different perspective. We have found that in an arm's-length transaction, DHLI (the licensee) would have paid a royalty for the use of the DHL trademark. The fact that no royalty was paid to DHL was attributable to the lack of arm's-length conditions when the 1974 MOA was created and went into effect. That royalty-free arrangement was perpetuated until the foreign investors became a collective majority in the international portion of the DHL network, and DHL transferred its ownership in the trademark to another entity. Up until the time the foreign

investors became involved, no question about DHL's ownership and the 1974 MOA had been raised, except by DHLI's general counsel, who had his own view about the registration and ownership of the trademark outside the United States. There is no indication that his view was shared by management or the respective corporate shareholders. It was not until the negotiations with the foreign investors and intensive due diligence and when individuals became motivated to reduce the contract price or value of the trademark that the general counsel's point of view about the ownership of the DHL trademark gained support. Accordingly, we hold that petitioners' royalty-free reporting position was not reasonable.

Petitioners also argue that they had substantial authority for their reporting positions. Section 1.6662-4(d)(3)(iii), Income Tax Regs., provides that "substantial authority" includes applicable Code provisions, regulations, and court cases. Petitioners contend that they complied with the arm's-length standard of section 482 because their reporting position for the trademark sale reflects the value determined through arm's-length negotiations. Petitioners also rely on Ciba-Geigy Corp. v. Commissioner, 85 T.C. 172, 226-227 (1985), where the Court relied upon offers from an uncontrolled party, including an offer made a year before the controlled license in deciding an arm's-length royalty question.

The question of substantial authority here is not so much one of legal authority, as of factual authority for the reporting

positions regarding the trademark and royalties.  As we have already explained, petitioners did not have substantial factual "authority" for their reporting position on the trademark and royalties.  The fact pattern here does not fit within the cases cited by petitioners.  Moreover, petitioners clearly fell within the ambit of section 482 and the appropriate regulations with respect to the trademark and royalties.

Petitioners also argue that they had reasonable cause within the meaning of section 1.6664-4(b)(1), Income Tax Regs.  The determination of whether a taxpayer acted with "reasonable cause and in good faith" is made on a case-by-case basis, taking into account all pertinent facts and circumstances, the most important of which is the extent of the taxpayer's efforts to assess his proper tax liability.  Petitioners argue that they had reasonable cause here because of their reliance on the advice of professionals, such as an appraiser.  As we have already explained above, petitioners' reliance on Bain was not well founded.

Finally, as a computational matter, the 40-percent penalty of section 6662(h) applies to the trademark adjustment because there is a gross valuation misstatement.  In that regard, the $20 million reporting position was 25 percent or less than the fair market value or arm's-length price.  Because we have found that the adjustment should be made in 1992, section 6662(h) will apply only to the trademark adjustment for the 1992 year.  The royalty

adjustments for all 3 years shall be subject to the 20-percent penalty of section 6662(b).  With respect to the remaining adjustments, section 6662 is not applicable.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155.</u>

APPENDIX

1.  Newco (ITS) would recapitalize in accordance with the ITS stock purchase agreement;

2.  Robinson and ALTD would sell 10,764 Newco shares to the purchasers for $53,097,736 (JAL and Lufthansa each 4,780 shares for $23,579,262 and Nissho Iwai 1,204 shares for $5,939,212) in accordance with the amended and restated ITS stock purchase agreement;

3.  Newco would issue 8,054 Newco shares to the purchasers for $39,725,000 (JAL and Lufthansa each 3,222 shares for $15,890,000 and Nissho Iwai 1,610 shares for $7,945,000);

4.  under the asset transfer agreement, International would sell assets with a value of $39,725,000 to Newco for a like amount of cash;

5.  the purchasers would sell to Mattawan all of their International shares in exchange for Mattawan demand promissory notes (JAL and Lufthansa 646,000 shares each for $15,890,000 and Nissho Iwai 323,000 shares for $7,945,000);

6.  International would declare and pay a $39,725,000 cash dividend to Mattawan that would in turn use the cash to repay the notes issued in step 5;

7.  Newco would issue an additional 38,684 Newco shares to the purchasers for $177,411,262 and the shares representing the 12.5-percent interest in MNV (JAL and Lufthansa each 16,999 shares for $78,599,196 and 5 percent of MNV's shares and Nissho

Iwai 4,686 shares for $20,212,870 and 2.5 percent of MNV's shares);

8.  under the asset transfer agreement, International would sell all its remaining assets to Newco in exchange for (1) the assumption by Newco of the designated liabilities, (2) $142,356,262 in cash (subject to a closing adjustment) and (3) 31,779 Newco shares;

9.  International would declare and pay as a dividend to Mattawan the $142,356,262 and 31,779 Newco shares received in step 8;

10.  Mattawan would transfer to Express B.V. all of its outstanding shares of International (11,305,000 shares directly owned by Mattawan and 1,615,000 shares indirectly owned by Mattawan pursuant to step 5) in exchange for the payment by Express B.V. of $15,055,000.

The steps of the Newco Share Alternative pursuant to the amended share purchase and option agreement, as amended, were depicted schematically as follows:

[REPORTER'S NOTE:  SCHEMATIC ILLUSTRATION ACCOMPANYING OPINION WAS NOT ELECTRONICALLY REPRODUCIBLE.]